Virginia R. Travis ("the wife") appeals a final judgment of divorce. The wife and Francis Edwin Travis ("the husband") married on June 20, 1984, after having lived together since March 1979. Six children were born to the couple; five were minors at the beginning of this proceeding. The wife asked the husband to move out of the marital home on February 21, 2002, based on her suspicions that he had committed adultery. Initially all of the children remained with the wife, but two weeks after the husband moved out the 15-year-old daughter left to be with her father, who had moved in with his parents. At the time of the hearing, the 18-year-old son had moved out of the marital home, leaving three minor children residing with the wife.
The trial court held hearings on September 6, 2001, and on January 10, 2002, during which it received ore tenus evidence. During the hearings, the wife testified that she had raised the children as Jehovah's Witnesses. She stated that before her separation from the husband she had worked outside the home only occasionally. The wife testified that at the time of the hearings, she was working as a bank teller, earning $588 every two weeks, but that she has no savings or any retirement benefits yet. She stated that her husband worked for Anchor Bay Marina, that his parents had owned the marina at one time, and that her husband had worked at the marina throughout the marriage. His income affidavit stated that his monthly gross income was $2,480.76. He testified that his annual salary would change under a new employment contract pursuant to which his salary is calculated by adding sales commissions to a base salary. Because she has no retirement plan, the wife asked that she be awarded one-sixth of the stock options given her husband by his employer.
The husband and the wife owned a home in Eclectic, Alabama, which they purchased in June 1985. She stated that the note secured by the original mortgage had been completely paid, but that, in order to renovate and enlarge the house, the couple had taken out another mortgage on the property, and the balance on that loan secured by that mortgage was over $17,000. The wife testified that her husband had been sentenced to prison three different times for drug-related offenses. The wife gave extensive testimony regarding her husband's extramarital associations with other women throughout their marriage. She testified that the final event precipitating the divorce occurred when *Page 179 
she returned from an out-of-town trip to find a drugstore receipt for spermicide on her husband's bed-side table. The wife testified that she underwent surgery to prevent pregnancy 11 years before the hearing, and therefore no longer has any need for such a product. She identified a check written to CVS Pharmacy on the same date as the receipt, for the exact amount of the receipt, which was signed by her husband.
The wife requested that she be awarded the marital home and its furnishings, except specific items she stated were her husband's; she also testified concerning the debts accumulated during the marriage. The wife stated that since the separation she had paid all of the house mortgage payments, the utility bills, the credit card payments, and all household-related expenses. The wife asked for custody of the three minor children currently residing with her, as well as child support pursuant to the child-support guidelines.
The wife stated that she was willing for the husband to keep the 1996 Oldsmobile automobile, the 1986 Nissan 300-ZX automobile, the 1990 Dodge truck, the houseboat, the deck boat, the sailboat, and the riding lawnmower. She requested that the teenage daughter living with her be given the 1986 Honda Accord automobile. The wife also requested that the husband help pay her attorney fees.
Testimony was presented concerning the husband's alleged extramarital activities. Carolyn Sullivan testified that while she was married she occasionally went out drinking with the husband "when her husband was not around." She recounted a time when she, a woman named Stephanie, and the husband drove to Lake Martin late one night after they had been drinking. She also stated that the husband had been in the hot tub at her lake house. Another witness, Ray Foster, corroborated Sullivan's testimony, testifying that on one occasion the two women and the husband drove to his campsite at Lake Martin around midnight.
Martha Seibert, one of the owners of Anchor Bay Marina, also testified. She stated that both the husband and Sue Gerhardt were employed at Anchor Bay Marina selling boats. Seibert stated that the husband's annual salary was around $32,000, and that the husband had an option to purchase stock in the business. Seibert also stated that the husband would soon be making a salary of $15,000 plus commissions, and she expected that under the new arrangement he would earn at least what he had earned the previous year.
Seibert stated that the husband and Gerhardt had taken various business trips together, including trips to Texas, Florida, Atlanta, and Las Vegas. She said that she had seen the husband and Gerhardt together in the lounge at the marina having a drink. Seibert said that she became so suspicious that the two were having an affair that she talked to both of them. According to Seibert, her talk with Gerhardt lasted several hours.
Sue Gerhardt also testified. She stated that she and her husband had separated in March 2001. Gerhardt testified that for several months she drove the husband's car or truck, but that she never paid for the use of his vehicles. She also stated that she and the husband often ate lunch together. Gerhardt testified that she and the husband often attended business functions together and that, on one occasion, they had shared a room in Las Vegas. Throughout her testimony Gerhardt denied that she had been, or was, having an affair with the husband.
The husband testified that he had been living with his parents since February *Page 180 
2001. He confirmed that one daughter was also living there and that three of the minor children still lived with their mother. His version of the events preceding the separation was inconsistent. Initially he stated that he did not know why his wife asked him to leave, and he denied that he had ever purchased spermicide from the drug store. He later admitted that he did purchase the spermicide.
The husband stated that he had been convicted of several drug offenses and that he had been incarcerated multiple times, once for as long as two years and three months. He testified that while he was in prison, his wife applied for Aid to Families with Dependent Children and that the State had been trying to collect that money from him for 20 years. The husband estimated that he owed the State about $8,000. When questioned about a $1,500 deposit he had made into his checking account in May 2001, the husband stated he did not know the source of that money.
The husband stated that he and his wife had separated several times before February 2001. He testified that during the course of their marriage, the wife had accused him of seeing other women. He stated that the wife had worked in several short-term jobs to help pay the household bills, but that "she never worked." He testified regarding the upcoming change in his salary. The husband asked for joint custody of the three children living with his wife and primary physical custody of the daughter currently living with him.
Next, the husband described the purchase of the marital residence and discussed the outstanding debt on the house. The husband testified regarding the family vehicles and which ones had outstanding balances on the loans used to purchase the vehicles. He stated that he wanted the master bedroom suite, a pair of "pub" tables, some antiques, and numerous items that had been bequests from his grandmother. He stated that he wanted one television, and he discussed a number of marital debts.
The husband called his mother, Sara Travis, as a witness. She testified that she was not aware of any affairs that the husband might have had, either before or during the separation. She stated that in the past she had made mortgage payments on the marital residence for the husband and the wife.
Following the hearing on January 10, 2002, the trial court issued a final judgment of divorce. The trial court awarded the husband and the wife joint custody of the four minor children. The trial court granted the husband physical custody of the teenage daughter who was living with him, granted the wife physical custody of the three minor children who were living with her, and established a visitation schedule for both parents. The fifth minor child attained the age of 19 during the pendency of this divorce. The trial court ordered the husband to pay $492.69 in monthly child support and attached a CS-42 form to the judgment. Further, the trial court ordered the husband and the wife to share equally the medical expenses for the minor children.
The trial court awarded possession of the marital residence to the wife and ordered her to make the mortgage payments. In addition, the trial court ordered the wife to pay all the debt that was in her name alone and one-half of a marital debt in the amount of $700 owed to ML Acceptance. The judgment awarded the husband the master bedroom suite, several other pieces of furniture, all the boats, all but one of the vehicles, and his stock options. The trial court ordered the husband to pay all other debts, including all money owed the State and one-half of the debt owed to ML Acceptance. The trial *Page 181 
court awarded the wife the contents of the marital residence except the master bedroom suite and certain pieces of personal property and furniture that were awarded to the husband. The trial court considered the issue of alimony, but denied it for either party and did not reserve the issue.
The wife filed a postjudgment motion, requesting (1) a clarification of the future ownership of the marital residence and (2) a judicial finding regarding the allegations of adultery. The husband filed a response on February 19, 2002. On March 13, 2002, the trial court heard argument on the motion and modified the judgment as follows:
 "[I]nsofar as deed on marital residence to remain as joint survivorship with exclusive right of possession during minority of children, and the Court determines [sic] finds insufficient evidence of adultery and therefore grants divorce on incompatability [sic]."
(R. 3.)
The wife appeals. She argues that the trial court erred when it (1) denied alimony and did not reserve the issue, (2) failed to award the marital home to the wife, (3) did not award the wife a share of the husband's stock options, (4) failed to award the wife an attorney fee, and (5) awarded the husband the master bedroom suite.
A divorce judgment based on evidence presented ore tenus is afforded a presumption of correctness. See Robinson v. Robinson, 795 So.2d 729
(Ala.Civ.App. 2001). Such a judgment will be reversed only where it is so unsupported by the evidence as to be plainly and palpably wrong. 795 So.2d at 733. This court has previously stated that "[t]he question whether to award alimony is entrusted to the sound discretion of the trial court, and the court's ruling on that question will not be set aside absent an abuse of discretion." Crenshaw v. Crenshaw, 816 So.2d 1046,1049 (Ala.Civ.App. 2001), citing O'Neal v. O'Neal, 678 So.2d 161, 164
(Ala.Civ.App. 1996). "On appeal the division of property and the award of alimony are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either issue." Russell v. Russell, 844 So.2d 1215, 1218 (Ala.Civ.App. 2002), citing O'Neal v. O'Neal, supra.
When dividing marital property and determining whether to award alimony, a trial court should consider several factors, including the length of the marriage, the age and health of the parties, the future employment prospects of the parties, the source, value, and type of property owned, and the standard of living to which the parties have become accustomed during the marriage. See Ex parte Elliott, 782 So.2d 308
(Ala. 2000). The wife's first three issues on appeal require this court to thoroughly review the trial court's division of the marital property in light of the trial court's denial of an award of alimony.
In the division of property, the husband received all the boats and all but one of the vehicles the couple owned. The wife received the contents of the marital home except specific items that were awarded to the husband. The record is clear that the husband currently makes over twice as much in salary as the wife, with the prospect of making even more under a new salary arrangement. Also, the husband received all of the stock options that eventually will provide him a sizable income in the future. For the duration of the children's minority, the judgment awarded the wife possession of the marital home, subject to her making the mortgage payments. However, ownership of the home remained joint with the husband. The wife was not awarded a single marital asset in her name alone. The judgment *Page 182 
divided the remaining debts between the husband and the wife and required the parties to split equally the minor children's medical expenses.
At the time of the divorce, the wife, who had rarely worked outside the home during the marriage, was earning approximately $15,000 annually as a bank teller. She had no savings and no retirement plan. The husband, who had worked throughout the marriage, was moving from an annual salary to a commission-based income. The evidence revealed that he would earn at least as much under the new salary arrangement as he had earned previously. The husband also had $150,000 worth of stock options in the business where he worked. The evidence indicated that those stock options were offered to him in lieu of a retirement or pension plan. The husband's options first accrued in January 1999, during the marriage, and he could exercise the options incrementally until December 2005.
In this case the combination of the wife's low income and lack of assets together with the trial court's failure to award alimony renders the judgment inequitable. If the trial court had awarded the wife a substantial asset (such as the marital residence or a portion of the husband's stock options), then the failure to award alimony might not rise to reversible error. The trial court's failure to follow the factors in Ex parte Elliott, supra, requires this court to reverse the judgment and to remand the cause. See, e.g., Foley v. Foley, [Ms. 2010311, October 4, 2002] ___ So.2d ___ (Ala.Civ.App. 2002); Russell v. Russell, supra; and Nichols v. Nichols, 824 So.2d 797 (Ala.Civ.App. 2001).
Furthermore, in Crenshaw v. Crenshaw, 816 So.2d 1046 (Ala.Civ.App. 2001), we noted that a trial court's failure to at least reserve the issue of alimony often constitutes reversible error. A trial court should reserve the issue of alimony if the facts indicate that future circumstances may entitle either party to a later award of alimony. Id.
at 1048. We have consistently held that failure to reserve the issue of alimony divests the trial court of jurisdiction to entertain such a request in the future. See Hanna v. Hanna, 688 So.2d 887 (Ala.Civ.App. 1997); Pilgrim v. Pilgrim, 596 So.2d 942 (Ala.Civ.App. 1992). We pretermit discussion of the wife's last two issues on appeal because the trial court will have the opportunity to address them on remand.
REVERSED AND REMANDED.
Yates, P.J., and Thompson and Murdock, JJ., concur.
Crawley, J., concurs in the result.