[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 822 
Amanda Denise Williams ("the wife") has filed two appeals arising from the same litigation.[1] The appeal in case number 2020879 is from an April 1, 2003, judgment, as amended on May 23, 2003 ("the divorce judgment"), divorcing the wife from Thomas Timothy Williams ("the husband"). The appeal in case number 2030105 is from a September 23, 2003, order of the trial court modifying the custody and visitation rights of the parties.
The first appeal presents issues as to the trial court's division of property, its decision not to award alimony to the wife, and the award of visitation rights to the husband. We affirm the divorce judgment insofar as it relates to the visitation rights of the husband, but we reverse that judgment with respect to the issue of the property division and alimony. We dismiss the latter appeal because the trial court was *Page 823 
without jurisdiction to enter the September 2003 order.
I. The Appeal in Case No. 2020879
The parties were married on February 18, 1995, in Dale County. The husband is a farmer. It is undisputed that the husband began fanning by helping his father, Joe Williams (sometimes hereinafter referred to as "Mr. Williams"), who has enjoyed a long and successful farming career. The evidence is in conflict as to the exact nature of the current relationship between the husband and Mr. Williams insofar as their farming operations are concerned; however, there is substantial evidence indicating that the husband continues to work closely with Mr. Williams.
Before the husband and the wife were married, the husband's mother, Faye Williams ("Mrs. Williams"), had sole bookkeeping responsibility for the Williamses' farming operations. Mrs. Williams testified that she was the bookkeeper for the farming operations and that she ran errands and worked in the house. Accordingly, Mrs. Williams considered herself a full "partner" in the farming operations.
After the parties were married, the wife assisted Mrs. Williams with, among other things, the bookkeeping, writing checks for the husband's expenses, and helping prepare the parties' tax returns. Before the marriage, the wife had been employed for several years with Southeast Alabama Medical Center in Dothan, Alabama, as an accountant. The wife was already familiar with the responsibilities of a farmer's wife, because her father is also a farmer in the same community. The husband, according to his own testimony, has a learning disability that makes it difficult, if not impossible, for him to do the bookkeeping himself.
The wife testified that she also assisted with "outdoor" farm work full-time from September 1995 to January 1996. At that time, the wife began employment as a loan administrator with Regions Bank, through which she obtained family health-insurance coverage for herself and the husband. The wife testified that, in addition to doing the farm's bookkeeping, she continued to provide assistance with outdoor farm work during her lunch hour, after work, and even during vacations from her bank job.
As evidence of the success of their farming operations, the husband and wife were named as the "Top Farm Family" among Alabama peanut farmers by the Alabama Farmers Federation in 1996. The parties presented conflicting evidence at trial as to whether the fanning operation was conducted, either in whole or in part, in a partnership with the husband's father.[2] It is unclear what, if any, conclusion the trial court reached as to this issue in making its division of the parties' property; however, we do not find it necessary to resolve this issue in order to conclude, as discussed below, that the trial court's property division Was inequitable.
According to an appraisal obtained by the wife, the parties' farm equipment, excluding certain vehicles, was worth $122,250. According to evidence introduced by the husband, the farm equipment, had a total value of $128,750, including *Page 824 
$14,750 in value attributable to the vehicles excluded from the wife's appraisal.
In July 2001, the parties bought approximately 19 acres of real property that had been owned by members of the husband's family for several generations, and, thereafter, they built and lived in a house on that property. The husband testified that the land had sentimental value to him. The house and the real property (hereinafter referred to as the "marital home") are owned jointly by the husband and the wife, and, until the husband mortgaged the marital home during the course of the divorce proceedings, the marital home had never been encumbered.
The wife's annual salary from her employment with Regions Bank — which had gradually increased from less than $20,000 to approximately $26,000 over the course of her employment — was directly deposited into a money-market account at a brokerage firm, A.G. Edwards and Sons, Inc. ("the A.G. Edwards account"), during the parties' marriage. The parties used this account to fund their farming operations. Because of the availability of the funds in the A.G. Edwards account, it was not necessary before 2002 for the parties to obtain what is commonly referred to as a "crop loan" or to otherwise borrow any moneys to support themselves or their farming operations. At the time of the divorce, there was $91,840.95 in the account.
In response to a motion by the wife, the trial court entered an order on September 30, 2002, allowing an appraisal of the marital home by a professional appraiser. The resulting appraisal, which was admitted into evidence at trial, set the value of the marital home at $224,300. The husband testified at trial, however, that the value of the marital home was only $208,000.[3]
The parties have one child, a daughter, who was born on December 27, 2001. Shortly after the birth of their daughter, the parties began fighting over the care and custody of the child, and the wife moved out of the marital home with the child, At some point, the husband began a relationship with another woman, but the parties dispute whether this was before or after the parties' separation, and it is not clear if this relationship contributed to the breakup of the parties' marriage. It is undisputed, however, that the husband began the relationship before the trial of this case.
On April 17, 2002, the wife filed a complaint for a legal separation. That same day, the trial court entered an order granting temporary custody of the child to the wife and prohibiting the husband from "transferring, concealing, encumbering, or otherwise disposing of personal and/or specific property mutually owned or leased by the parties."
The husband filed a motion requesting the trial court to grant him pendente lite visitation rights; that motion was granted. The husband was granted visitation with the child on Wednesday evenings and on alternating Saturdays and Sundays.
There were numerous delays in the litigation, and it eventually became necessary for the husband to find funds to support his 2002 farming operations. The trial court's April 17, 2002, order had prohibited the husband from accessing the funds in the AG Edwards account. Thus, on July 3, 2002, the husband obtained a $150,330 loan from First South Farm Credit ("First South"). To obtain the loan, however, the husband executed a mortgage on the parties' *Page 825 
marital home and granted First South a lien on, among other things, the accounts, crops, supplies, and equipment of the parties' farming operation.[4]
On August 8, 2002, the wife amended her complaint to request a divorce and an equitable division of the parties' property. On October 4, 2002, the trial court ordered the husband to pay $616 per month in child support from that point forward, as well as $616 per month retroactively to May 2002.[5] The court gave the husband a $6,000 credit toward the payment of the child-support award, however, in order to offset the wife's withdrawal of $6,000 from the parties' bank account after moving out of the marital home. On October 16, 2002, the trial court modified its pendente lite visitation order, granting the husband visitation on Thursday evenings and on alternating weekends and holidays. Visitation during the summer months was to include 30 consecutive days with the husband, during which the wife would have visitation every other weekend.
The husband introduced evidence that his income in 2002 was only $8,281. In January 2003, however, the husband made two large deposits into his bank account — a deposit in the amount of $71,396.96 and a deposit in the amount of $39,458.16. According to the wife's testimony, those deposits represent income deferred from 2002 to 2003. There was evidence that such deferrals are a common practice among farmers and are done for tax purposes.
As of January 31, 2003, the husband still owed First South $45,490 from the previous year's loan. He renewed that loan and, using the same security as he had used to obtain that loan, entered into an agreement with First South for a loan of up to an additional $120,500, though none of the additional loan amount had been disbursed at the time of trial.
The trial court held ore tenus proceedings on February 3, 2003, and March 5, 2003. At the February 3, 2003, hearing, the husband testified that he intends to continue fanning; the wife testified that she has no such intention. Accordingly, on February 6, 2003, the trial court entered an interlocutory order granting the husband the right to continue using the "base" that had been established for the farming operation under the Farm Security and Rural Investment Act of 2002, 7 U.S.C. § 7901 et seq. ("the 2002 Farm Bill"). Under the 2002 Farm Bill, the base entitles the husband to receive federal subsidies based on the acres cultivated and the crops produced each year.
Following the conclusion of the trial, the trial court entered a final judgment on April 1, 2003, awarding the parties joint legal custody of the child, with the wife having primary physical custody and the husband having visitation rights. The wife was ordered to provide health-insurance coverage for the child, with the wife to pay 52% and the husband to pay 48% of the medical expenses not covered by insurance. The husband was ordered to pay $468 per month in child support in accordance with the Rule 32, Ala. R. Jud. Admin., *Page 826 
Child Support Guidelines. In response to a postjudgment motion filed by the wife pursuant to Rule 59, Ala. R. Civ. P., the trial court increased the child support to be paid by the father each month to $565.
The wife has a 401(k) retirement account through her job at Regions Bank worth $11,781.82, and individual retirement accounts ("IRAs") with a total worth of $9,151.51. The husband has IRAs worth $23,072.51. The trial court's judgment awarded each party his or her retirement accounts and awarded 80% ($73,472.76) of the AG Edwards account to the wife and 20% ($18,368.19) to the husband.
The trial court awarded the marital home and all the farm equipment (including the vehicles) to the husband. The wife was awarded her Chevrolet Blazer vehicle, which had been purchased at a cost, according to the husband's testimony, of between $22,000 and $26,000. The trial court awarded no alimony to the wife.
The wife argues on appeal that the trial court erred in the division of property and in failing to award alimony or, in the alternative, reserving jurisdiction over the question of alimony. The wife also contends that the visitation ordered by the trial court constituted an abuse of discretion. We agree that the trial court's division of property is inequitable and that the trial court erred in failing to reserve the question of alimony.
 A. The Issues of Property Division and Alimony
We begin by noting the appropriate standard of review in divorce proceedings. "Trial judges enjoy broad discretion in divorce cases, and their decisions are to be overturned on appeal only when they are `unsupported by the evidence or [are] otherwise palpably wrong.'" Ex parte Bland, 796 So.2d 340, 344
(Ala. 2000) (quoting Ex parte Jackson, 567 So.2d 867, 868 (Ala. 1990)). Also, when, as in this case, a trial court's judgment is based on ore tenus evidence, the judgment is presumed correct.Kennedy v. Kennedy, 743 So.2d 487 (Ala.Civ.App. 1999). The presumption or correctness under the ore tenus rule "is based on the trial court's unique position to observe the witnesses and to assess their demeanor and credibility." Glazner v. Glazner,807 So.2d 555, 559 (Ala.Civ. App. 2001); Hall v. Mazzone,486 So.2d 408, 410 (Ala. 1986).
Matters such as alimony and property division are within the sound discretion of the trial court, Ex parte Drummond,785 So.2d 358 (Ala. 2000); Parrish v. Parrish, 617 So.2d 1036
(Ala.Civ.App. 1993); and Montgomery v. Montgomery,519 So.2d 525 (Ala.Civ.App. 1987). The issues of property division and alimony are interrelated, and they must be considered together on appeal. Albertson v. Albertson, 678 So.2d 118 (Ala.Civ.App. 1996).
In dividing property and awarding alimony, the trial court should consider "the earning abilities of the parties; the future prospects of the parties; their ages and health; the duration of the marriage; [the parties'] station in life; the marital properties and their sources, values, and types; and the conduct of the parties in relation to the cause of the divorce," Russellv. Russell, 777 So.2d 731, 733 (Ala.Civ. App. 2000). Also, the trial court is not required to make an equal division of the marital property, but it, must make an equitable division based upon the particular facts and circumstances of the case. Goldenv. Golden, 681 So.2d 605 (Ala.Civ. App. 1996); Brewer v.Brewer, 695 So.2d 1 (Ala.Civ.App. 1996). "A property division that favors one party over another does not necessarily indicate an abuse of discretion." Fell v. Fell, 869 So.2d 486, 496 *Page 827 
(Ala.Civ.App. 2003) (citing Dobbs v. Dobbs, 534 So.2d 621
(Ala.Civ.App. 1988)).
 "The purpose of periodic alimony is to support the former dependent spouse and to enable that spouse, to the extent possible, to maintain the status that the parties had enjoyed during the marriage, until the spouse is self-supporting or maintaining a status similar to the one enjoyed during the marriage."
O'Neal v. O'Neal, 678 So.2d 161, 165 (Ala. Civ.App. 1996).
As noted, the trial court awarded the following property to the husband: the marital home, the, husband's IRAs, the farm equipment, and 20% of the A.G. Edwards account. The wife was awarded her Regions Bank 401(k) account, her IRAs, the 2000 Chevrolet Blazer, and 80% of the A., G. Edwards account.[6]
We must view the evidence in the light most favorable to the trial court's judgment, see Driver v. Hice, 618 So.2d 129, 131
(Ala.Civ.App. 1993), and therefore we use the husband's asserted valuations for the respective items of property awarded to both him and the wife. On this basis, the husband was a warded real and personal property, excluding household goods, with a value of $378,190.70,[7] and the wife was awarded assets, other than, household goods, with values totaling $119,406.09.[8]
We recognize that, of the over $378,000 in asset value awarded to the husband, $128,750 is attributable to the farm equipment and that the trial court might have found that the source of some of that value was Mr. Williams and may have considered that source in awarding the equipment to the husband. The trial court might also have accepted the husband's evidence that $91,250 of that equipment was owned "on halves" with the husband's father. On the other hand, it is undisputed that the wife made at least some contribution to the farming operation during the marriage and that the farm equipment was used for the benefit of the parties during their marriage. Moreover, even if all of the $128,750 in farm equipment value is subtracted from the value of the assets awarded to the husband, the husband still received marital property valued by the *Page 828 
husband at $249,440.70, including the marital home valued by the husband at $208,000.
The husband argues that the difference in the value of the assets awarded to him and the value of the assets awarded to the wife can be explained, in part, by the fact that the husband has a substantial mortgage debt on the marital home. This argument ignores several facts. First, it is the husband alone who has enjoyed and is enjoying the benefit of the loan proceeds secured by the mortgage. Further, the total of $110,855.12 in deposits made by the husband in January 2003 clearly was attributable to his farming operations during 2002 and is available to reduce or eliminate the mortgage debt. Indeed, the record clearly establishes that the husband obtained this loan because the funds in the A.G. Edwards account were no longer available to him as they had been in years past and that repayment of the loans he took out in both 2002 and 2003, in large measure, simply represent part of the cost of the farming operation. Furthermore, there is evidence that the husband has used part of the loan proceeds to pay child support and to fund his daily living expenses. (The husband was in arrears on his pendente lite child support on the day he testified at trial, but he stated that he would make the payment when the proceeds from the January 31, 2003, loan were deposited into his account.)[9]
After carefully reviewing the record on appeal, we conclude that the trial court's award of the parties' marital assets in a manner that so heavily favored the husband is not supported by that record. Considering the parties' earning abilities, future prospects, their ages and health, the duration of the marriage, their station in life, the marital properties and their sources, values, and type, and the conduct of the parties in relation to the cause of the divorce, we hold the property division to be inequitable.
As to the failure of the trial court to award alimony, or to at least reserve the right to do so at a future date, we note that "[w]hen a trial court does not award periodic alimony in a divorce case, or does not reserve the right to do so upon future consideration, its power to award alimony is permanently lost,"Kennedy v. Kennedy, 743 So.2d 487, 490 (Ala.Civ.App. 1999). The trial court's failure to at least reserve jurisdiction over the issue of alimony often constitutes reversible error. Travis v.Travis, 849 So.2d 177 (Ala.Civ.App. 2002). The trial court should reserve jurisdiction over the issue of alimony if the facts indicate that future circumstances may entitle either party to a later award of alimony. Crenshaw v. Crenshaw, 816 So.2d. 1046 (Ala.Civ.App. 2001).
Given the length of the parties' marriage, the wife's current employment, and the disparity in the parties' earning potential, the court should have reserved the right to award periodic alimony at a later date if future circumstances justify such an award. The evidence indicates that, as a farmer, the husband's income is likely to vary considerably from year to year, and may increase substantially,[10] *Page 829 
while the evidence tends to indicate that the wife's income will not increase substantially. The parties' tax returns from previous years indicate that the farming operations generated net income of $40,407 in 2001 and $66,869 in 2000. Even viewing the evidence in the light most favorable to the husband, as we are required to do, the evidence in this case leads us to conclude that the trial court erred in failing to reserve the issue of alimony.
We reverse the trial court's divorce judgment insofar as it relates to the division of marital assets and insofar as it fails to award alimony. We remand the cause for the trial court to more equitably divide the marital property and to reserve jurisdiction over the question of alimony for future consideration.
 B. Visitation
The trial court entered several pendente lite visitation orders, as described above. As part of its final divorce judgment, the trial court included as "Appendix A" to the judgment a standard visitation order, which includes a provision that the husband will have visitation with the child for "two periods of 3 consecutive weeks." The trial court amended this provision in its May 19, 2003, postjudgment order. In that order, the trial court stated:
 "During the stated summer visitation [the wife] shall have visitation with the minor child the second weekend of each three-week period from 6:00 p.m. on Friday until 6:00 p.m. on Sunday, provided, however, that if any State or Federal holiday falls on a Friday prior to or a Monday subsequent to the weekend visitation period, then said holiday shall be included in said weekend visitation period. At least 4 days['] notice of intention to exercise weekend visitation shall be given. In addition, the [wife] shall have the minor child for overnight midweek visitation one weekday per week from 5:00 p.m. until 8:00 a.m. the following day, to be agreed upon by the parties. In the even the parties cannot agree, the midweek visitation shall be on Wednesday evening until Thursday morning."
The wife objects to the above provision, as well as to the following additional provision:
 "In addition to the visitation provided in Appendix `A,' the [husband] shall have the minor child for daycare and visitation each Tuesday from 8:00 a.m. (or such time convenient for [the wife] to deliver the child to [the husband] for daycare) until Wednesday at 6:00 p.m. until the child begins attending school full time, e.g., kindergarten or first grade from 8:00 a.m. until 3:00 p.m. Such midweek daycare and visitation shall be superseded by any conflicting provisions in Appendix `A'. The parties shall also comply with certain rules of conduct which generally apply to custody matters as set forth in Appendix `B'.
 "The exchange of custody of the child for all visitation shall occur at the Midland City Police Station, Midland City, Alabama. Any responsible relative of either parent authorized by the parent to provide transportation for visitation shall be allowed to do so. Any such person providing said transportation, including the parents, are ordered to refrain from harassing, annoying, intimidating, threatening or molesting any other party involved in the exchange of custody. No audio or video recording devices shall be used by any party during the exchange or custody. A violation of this order by any party to whom this provision applies will subject that person to contempt proceedings and the person will be prohibited from providing such transportation in the future." *Page 830 
The wife objects to this arrangement because, as a working mother, she does not see the child during the day, and this order, she argues, "unfairly deprives the wife of nighttime visitation with the child one day each week." She further argues that the weekend visitations and the extended three-week visitations with the husband during the summer are not in the child's best interest and that the child should remain with her as much as possible. The wife contends that the trial court should not have allowed the husband's parents to participate in the visitation and visitation exchanges because there has allegedly been trouble at the visitation exchanges in the past. Finally, the wife argues that during most of the year, while the husband is engaged in intensive farming work, the child would not benefit from additional visitation since the husband could not spend that evening with the child.
The husband disagrees, and he argues that it is better for the child to stay with him one day during the week rather than go to a day-care center, as she usually does while the mother is at her bank job. The husband points out that if he is farming while the child is in his custody, his mother is prepared to look after the child until he returns from the field. He argues that the trial court had ample opportunity to observe and evaluate his family, because both his mother and his father testified at the trial, and that there is substantial evidence to support the trial court's determination that this visitation schedule and the custody-exchange order are in the child's best interests.
The wife insists that the child should remain in her custody as much as possible, because she is better able to care for the child. To support her argument that she is the better parent, the wife relies on the testimony of a counselor with whom the parties had several sessions during the divorce proceedings. The counselor met with the wife four times, with the husband once, and with the parties together five times, all between April 23, 2002, and December 5, 2002. The counselor did not visit with the child and has not witnessed any interactions between the parents and the child.
The wife testified that the husband and the husband's mother have engaged in abusive behavior toward her, and she alleges that one of those incidents occurred while she was holding the child. The husband testified that the wife has been verbally abusive toward him and his family. Each party denies the other's allegations.
The trial court is in the best position to determine the credibility of the witnesses, to assign weight to their testimony, and to assess what is in the best interest of the child. "The determination of proper visitation . . . is within the sound discretion of the trial court, and that court's determination should not be reversed by an appellate court absent a showing of an abuse of discretion." Ex parte Bland,796 So.2d at 343. "The primary consideration in setting visitation rights is the best interest of the child. Each child visitation case must be decided on its own facts and circumstances." DuBois v.DuBois, 714 So.2d 308, 309 (Ala. Civ.App. 1998) (citation omitted). Based on the record before us, we cannot conclude that the trial court abused its discretion in setting the husband's visitation rights, and we therefore affirm that portion of the trial court's divorce judgment.
II. The Appeal in Case No. 2030105
The wife also has filed an appeal from the order dated September 23, 2003, in which the trial court found that the wife had refused to comply with the trial court's visitation order contained in the divorce *Page 831 
judgment. Based upon the visitation problems found by the trial court to exist between the parties, the trial court made what appears tantamount to a change of physical custody, ordering that each party would alternate having physical custody of the child for one week at a time.
"`[J]urisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu.'"Wallace v. Tee Jays Mfg. Co., 689 So.2d 210, 211 (Ala.Civ.App. 1997) (quoting Nunn v. Baker, 518 So.2d 711, 712 (Ala. 1987)). "`Appeals are of statutory origin, and, unless so provided, no appeal will lie. Johnson v. Barnes, 250 Ala. 292, 34 So.2d 144
(1948).'" Miles v. State, 822 So.2d 468, 469 (Ala.Crim.App. 2000) (quoting McCoy v. Garren, 384 So.2d 1113, 1114
(Ala.Civ.App. 1980)).
"`Once an appeal is taken, the trial court loses jurisdiction to act except in matters entirely collateral to the appeal.'Ward v. Ullery, 412 So.2d 796, 797 (Ala.Civ.App. 1982)."Horton v. Horton, 822 So.2d 431, 434 (Ala.Civ.App. 2001) (footnote omitted). In this case, the trial court's September 23, 2003, order was entered in response to motions and responses to motions pertaining to the interpretation, implementation, and enforcement of the custody and visitation provisions of the divorce judgment, particularly, the husband's "Motion to Enforce Visitation and for Immediate Pick-Up Order with Citation for Contempt and Award of Attorney's Fees." The husband did not file a new action, and the aforesaid motions and responses were filed as part of the same case in which the divorce judgment was entered. That case, however, already was pending on appeal to this court.
The husband argues that, in its order of September 23, 2003, the trial court was merely enforcing the provisions of the divorce judgment. We cannot agree with that proposition. The trial court clearly intended to, and did, make substantial modifications to the custody and visitation provisions of the divorce judgment. While a trial court retains the authority to interpret, clarify, and enforce its judgments, this does not give it the authority to cause a final judgment to state something other than that which was proclaimed in that judgment and thereby modify the vested rights of the parties. See, e.g., George v.Sims, 888 So.2d 1224 (Ala. 2004); Pate v. Pate, 849 So.2d 972
(Ala.Civ.App. 2002). The trial court no longer had jurisdiction over the case on September 23, 2003, and its September 23, 2003, order is therefore void. A void judgment will not support an appeal. Carter v. Hilliard, 838 So.2d 1062, 1064 (Ala.Civ. App. 2002).
 III. Conclusion
The trial court's judgment of April 1, 2003, as amended on May 19, 2003, is affirmed as to its provisions regarding visitation, but it is reversed as to its provisions regarding the division of marital assets and alimony. The cause is remanded for the trial court to make a more equitable division of the marital assets and to reserve jurisdiction over the question of alimony. The wife's appeal from the trial court's September 23, 2003, order is dismissed, and the trial court is instructed to vacate that order as void.
2020879 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
2030105 — APPEAL DISMISSED.
YATES, P.J., and THOMPSON, J. concur.
PITTMAN, J., concurs in part and concurs in the result in part as to case *Page 832 
number 2020879 and concurs as to case number 2030105, with writing, which CRAWLEY, J., joins.
[1] Both of these appeals arise from the case designated in the trial court as case number DR-02-184. The appellant filed a motion to consolidate the appeals; that motion was granted by this court.
[2] For example, both the husband and his father testified that the two of them conducted their farming operations as a partnership. Among other things, the husband introduced evidence that his father was a source of farm equipment, some of which was traded-in for newer equipment utilized in the farming operation. The husband also testified that he and his father owned some of the farm equipment "on halves." The wife disputed the joint ownership of the farm equipment and, among other things, presented evidence that the husband and wife listed all of the farm equipment at issue as depreciating assets on their own income-tax returns.
[3] The husband's stated basis for this valuation was that he knew what had been paid for the land and the house.
[4] The mortgage and the lien arguably were direct violations of the trial court's order prohibiting the encumbering of the parties' mutually owned property. The wife filed a motion asking the trial court to hold the husband in contempt; however, the trial court never expressly ruled upon this motion, though its failure to do so in its final judgment appears to imply a denial thereof. The wife does not raise an issue on appeal, however, as to whether the trial court should have found the husband in contempt.
[5] The record does not reveal the basis for the trial court's calculation of pendente lite child support.
[6] No values as to the household goods appear in the record, and we do not discern from the arguments of the parties in their briefs to this court that the division of household goods materially impacted the equity, or lack thereof, in the trial court's division of the property.
[7] The wife points to the "base" available to the husband under the 2002 Farm Bill as further evidence of the inequity of the property division made by the trial court. Although Dale Outlaw, regional vice president of First South, testified that the base, if sold by the husband, would have a value of approximately $45,000, it is also true that the base merely gives the husband the opportunity to conduct his farming operations and produce and sell the crops contemplated by that "base." As Outlaw explained, the portion of a farmer's annual revenues attributable to the base payments for his crops often represents the only profit for the farmer for the year. As noted, we must view the evidence in a light most favorable to the trial court's decision.See Driver v. Hice, 618 So.2d 129, 131 (Ala.Civ. App. 1993). Accordingly, we presume that the trial court viewed the "base" as an asset that, unless the trial court wanted to disrupt the husband's earning capacity, had no real transferable, i.e., marketable, value to the parties. The husband was required to retain and utilize the base in order to continue generating the income upon which the trial court based its examination of all of the issues in this case, including the issues of alimony, property division, and child support.
[8] This includes a $25,000 value assigned to the Chevrolet Blazer by the husband.
The husband also argues that the value of the assets awarded to the wife should include the $6,000 that she removed from the parties' joint bank account. As noted, however, the trial court gave the husband a credit for this withdrawal in relation to his child-support obligation.
[9] The husband also argues that the farm equipment and the marital home should not be considered marital property. We consider the husband's arguments in this regard to be without merit based on the record before us. See § 30-2-51 (a), Ala. Code 1975; Gartman v. Gartman, 376 So.2d 711, 713
(Ala.Civ.App. 1978).
[10] As noted, although the husband reported an income of only $8,281 in 2002, he deposited $110,855.12 into his bank account in January 2003, just before the trial of this case. This income was not reflected in his 2002 tax return or in his CS-41 income affidavit dated March 11, 2003.