MOORE, Judge.
Sherri Clark (“the wife”) appeals from a judgment of the Houston Circuit Court divorcing her from William T. Clark (“the husband”) to the extent that the judgment divided the parties’ property and declined to award her alimony or to reserve the right to award her alimony in the future. We affirm in part and reverse in part.

Procedural History

On May 9, 2008, the wife filed a complaint for a divorce from the husband. On June 13, 2008, the husband filed an answer to the complaint and counterclaimed for a divorce. The wife answered the counterclaim on June 18, 2008. On September 23, 2008, the trial court entered a temporary order divorcing the parties and incorporating an “Interim Stipulation and Agreement” entered by the parties but reserving all other issues until a final hearing.
After an ore tenus hearing, the trial court entered a final judgment on July 8,
2009, ordering the parties to sell the marital home and their second home; ordering the parties to equally divide the proceeds from the sale of both properties after paying the first and second mortgages on the properties and paying the fees and expenses associated with the sales; valuing the parties’ business, Buddy Clark Carpet, L.L.C. (“the business”), a retail floor-covering company of which each party owned 50%, at $6,419.17; divesting the wife of her interest in the parties’ business; awarding the wife $3,209.59 for her interest in the business; awarding the parties their respective retirement accounts; and ordering the parties to equally divide the household goods and furnishings in the marital home. The trial court also awarded the husband the parties’ two boats, a Range Rover automobile, the lawn equipment, and all of his personal property located in the shed adjacent to the marital home. The wife was also awarded her jewelry, a Chevrolet Silverado truck, and her personal effects. The wife was ordered to pay the balances owed on two Visa credit cards, a Saks Fifth Avenue credit card, and a Neiman Marcus credit card and to pay her personal medical bills. The husband was ordered to pay all other marital debt and to pay the mortgage payments on *1279 the marital home and the second home until those properties were sold.
On July 27, 2009, the wife filed a motion to alter, amend, or vacate the trial court’s judgment; that motion was denied on September 1, 2009. The wife filed her notice of appeal on September 28, 2009.

Discussion

I.
In its final judgment, the trial court divested the wife of her interest in the business, and it ordered the husband to pay the wife $3,209.59 for that interest. In reaching that value, the trial court relied exclusively on the expert testimony of a “knowledgeable” certified public accountant who based his value of the business on the “income approach” to valuation. See Birmingham, News Co. v. Horn, 901 So.2d 27, 65-66 (Ala.2004), overruled on other grounds by Horton Homes, Inc. v. Shaner, 999 So.2d 462 (Ala.2008) (discussing various business-valuation methods).
On appeal, the wife argues that the trial court “erred in valuing [her] interest in [the business] contrary to the provisions of the operating agreement entered into by the parties.”[1] The evidence shows that, when the parties formed the business in 2000, they signed an operating agreement. See Ala.Code 1975, § 10-12-24 (authorizing members of limited-liability company to enter into governing operating agreement). Section 2.2 of the operating agreement states, in pertinent part:
“2.2. ... In the case of Dissociation of a Member due to Section 1.2 or Section 1.8 of this Article XIII, the purchase price for the Membership Interest shall be determined as follows: (a) the Members (other than the Dissociated Member) shall appoint one (1) qualified appraiser and the Dissociated Member or his or her personal representative shall appoint one (1) qualified appraiser. The compensation of each appraiser shall be paid by the party appointing such appraiser; (b) both appraisers shall, in the utmost good faith, consult and conduct such examinations as are reasonably necessary to reach an agreed value and therefore the purchase for the Membership Interest of the Dissociated Member, which value and therefore purchase price, if agreed upon by both appraisers, shall be final and binding upon the Company, the Dissociated Member or her or her estate, if applicable, and the other Members; (c) if the two (2) appraisers cannot agree upon the value of the Membership Interest of the Dissociated Member the two appraisers shall appoint a third qualified appraiser and the three (3) appraisers shall conduct their examination as set forth above and the decision of the simple majority of the appraisers shall be final and binding upon the Company, the Dissociated Member or his or her estate, applicable and the other Members.”
Section 2.2 further defines “qualified appraiser” to mean
*1280 “an active and practicing commercial real estate appraiser in active practice for the last five (5) consecutive years prior to such appointment, or an active and practicing commercial real estate appraiser with an MAI certification or designation, regardless of the number of years in consecutive practice.”
The wife maintains that the operating agreement “provide[s], among other things, the manner in which the value of the share of the members would be determined should they be involuntarily dissociated from the business.” The wife further contends that she became involuntarily dissociated from the business when the trial court divested her of her interest in the business. The wife “submit[s] that the provisions of [§] 2.2 ... require! ] the determination of the [w]ife’s membership interest by evaluating the business with active and practicing commercial real estate appraisers with 5 consecutive years of experience or MAI certifications.” It is undisputed that the trial court, by relying on the testimony of an accountant who did not meet those criteria, did not determine the value of the business in accordance with § 2.2 of the operating agreement. Therefore, the issue, as framed by the wife, is whether the trial court erred in failing to follow the valuation procedure set out § 2.2 after involuntarily dissociating the wife from the business pursuant to the terms of the divorce judgment.[2]
The portion of § 2.2 of the operating agreement upon which the wife relies begins: “In the case of Dissociation of a Member due to Section 1.2 or Section 1.3 of this Article XIII.... ” (Emphasis added.) Section 1.2 of Article XIII pertains to dissociation of a member due to that member’s filing bankruptcy. Section 1.3 of Article XIII pertains to dissociation of a member due to the death of the member or the entry of a court order declaring that member incompetent to manage the member’s estate. Neither § 1.2 nor § 1.3 applies to an involuntary dissociation caused by a court’s order requiring a member to divest his or her interest in the business as part of a divorce proceeding.
The first part of § 1.5 of Article XII states that, “[sjhould a member desire to gift, sell, or otherwise convey ... his or her Membership Interest ...the member must first offer to sell the interest to the other members. In the event the sell *1281 ing and purchasing members cannot agree on the value of the membership interest, “then the purchase price shall be determined using the same procedure as is used to determine the purchase price in the event of the death of a Member as hereinafter set forth,” i.e., the procedure set out in § 2.2. By its plain terms, § 1.5 applies when one member voluntarily elects to convey his or her membership interest. In her appellate brief to this court, the wife concedes that she did not voluntarily elect to convey her membership interest in the business; she maintains that she was forced to sell her interest in the business involuntarily by order of the trial court.[3] Hence, based on the wife’s argument, § 1.5 simply does not apply.
By the plain terms of the operating agreement, the valuation procedure set out in § 2.2 applies only in the case of the death of a member, the bankruptcy of a member, the entry of an order declaring a member incompetent to manage the member’s estate, or the voluntary conveyance of a membership interest to another member. See Kinnon v. Universal Underwriters Ins. Co., 418 So.2d 887, 888 (Ala.1982) (“[A] court cannot refine away the terms of the contract that are expressed with sufficient clarity to convey the intent and meaning of the parties.”). Although the parties could have provided for a general provision that requires valuation according to the procedure set out in § 2.2 in the event of any type of dissociation, the operating agreement contains no such provision.[4] Similarly, the parties, who were married at the time they formed the business as its only members, could have provided that the valuation procedure would apply in the event a divorce led to the involuntary dissociation of a member. However, the parties elected not to include *1282 any such provision in the operating agreement. This court is powerless to rewrite the agreement for the parties.[5] Commercial Union Ins. Co. v. Rose’s Stores, Inc., 411 So.2d 122, 124 (Ala.1982) (“It is not a function of the courts to make new contracts for the parties, or raise doubts where none exist.”)- Rather, we are compelled to read and enforce the contract between the parties as written. Shoney’s LLC v. MAC East, LLC, 27 So.3d 1216, 1223 (Ala.2009) (“[W]e maintain our long-held position that a contract, under Alabama law, should be construed as written.”).
Because the terms of § 2.2 of the operating agreement do not govern valuation when a member becomes involuntarily dissociated from the business due to a divorce judgment,[6] we reject the wife’s argument that the trial court was obligated to follow the valuation procedure set out in § 2.2. We hold that the trial court did not commit any error by failing to follow the procedure set out in § 2.2 of the operating agreement when valuing the interest of the parties in the business for the purposes of equitably dividing that marital property.[7]
II.
The wife next argues that the trial court exceeded its discretion in its division of property and its failure to award her periodic alimony.
*1283 “The trial court is afforded a wide degree of discretion in dividing the marital assets of the parties upon divorce. Moody v. Moody, 641 So.2d 818 (Ala. Civ.App.1994). The only limitation on that discretion is that the division of property be equitable under the circumstances of the particular case, and the task of determining what is equitable falls to the trial court. Ross v. Ross, 447 So.2d 812 (Ala.Civ.App.1984). This court must consider the issues of property division and alimony together when reviewing the decision of the trial court, Albertson v. Albertson, 678 So.2d 118, 120 (Ala.Civ.App.1995), and, because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So.2d 620, 623 (Ala.Civ.App.1993). In making the division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their age and health, their conduct, the duration of the marriage, and the value and type of marital property. Lutz v. Lutz, 485 So.2d 1174 (Ala.Civ.App.1986) The property division made by the trial court will not be set aside on appeal absent a palpable abuse of that discretion. Id.”
Cantrell v. Cantrell, 773 So.2d 487, 489-90 (Ala.Civ.App.2000).
At the time of the final hearing, the parties had been married for 18 years. The husband was 54 and the wife was 44. The wife testified that she had no health problems, and there was no testimony indicating that the husband had any health issues. The parties presented little evidence regarding any fault for the breakdown of the marriage. Both parties had worked throughout the marriage. In 2000, the parties started the business and shared the income from the business equally. The husband testified that he had attended to the day-to-day operations of the business and that the wife had been in charge of the bookkeeping. The husband testified that, at the time of the trial, the wife was no longer working for the business and that he was drawing $3,000 per week from the business. The husband had been paying all the parties’ bills except for bills relating to four of the wife’s credit cards. The husband testified that the wife could get a job as a bookkeeper and that he pays his current bookkeeper $400 per week.
At trial, the husband testified that the marital home was listed for sale for $450,000 and that there was a first mortgage on the home with an outstanding balance of $193,173. He testified that the home was also subject to a home-equity line of credit with a balance of approximately $172,000. He testified that the first-mortgage payment on the house is $1,351.50 per month; a statement from the home-equity line of credit indicated that the minimum payment on that account is $952.21 per month. The husband testified that the parties also own a second house that he valued at approximately $155,000. He testified that the second house is subject to $128,777 in outstanding indebtedness and that the monthly payment on the indebtedness is $1,000.83.
The husband also testified that the parties own a 2003 Sea Ray 340 Sundancer boat that is valued at approximately $120,000 but that is subject to an outstanding indebtedness of $145,000. He also testified that the parties own a 2006 Triton boat worth approximately $17,000. He testified that the parties had probably used the home-equity line of credit to pay for a large portion of the Triton boat and that there is no other indebtedness associated with the boat. The husband testified *1284 that he has no retirement funds because he had withdrawn those funds and used them for living expenses during the divorce proceedings. The husband testified that the parties own a 2004 Silverado truck that is worth between $10,000 and $12,000 and that he owed two monthly payments of $527.62 on the truck. He also testified that the parties own a 2006 Range Rover automobile valued at approximately $43,000 with associated indebtedness of $32,986.49; the monthly payment on that automobile is $1,575.61. He testified further that the wife should have approximately $40,000 in her retirement account.
The wife testified that she has “a lot” of jewelry, including a ring that was purchased for $19,000. She also testified that she had sold her Louis Vuitton luggage for approximately $2,000. The wife testified that she owes $2,326.75 on a Saks Fifth Avenue credit card and that she had purchased items for herself, the parties’ children, and the husband using that card. She also testified that she owes $2,289 on a Neiman Marcus credit card. The wife testified that the debt on her credit cards had been accumulated over the previous 10 years. The husband, however, testified that he had not purchased anything at Neiman Marcus or Saks Fifth Avenue. The wife also testified that she owed a total of $24,600 on two Visa credit cards; she testified that, if she were to agree “to settle” the two accounts, she could save $9,761. She testified that the balances on the Visa cards had been accumulated both during the parties’ marriage and after the parties had separated. The husband testified that, before the divorce proceedings, he did not know that the Visa credit cards existed and that he did not think that any charges on those cards had been for his benefit. The wife, on the other hand, testified that the husband knew about those cards.[8]
Based on the foregoing, as well as the trial court’s valuation and disposition of the parties’ business interests, our calculations reveal that the trial court awarded the husband net assets of $59,692.86, or 35% of the marital property, and awarded the wife net assets of $110,279.84, or 65% of the marital property.[9]
The evidence indicated that the business had provided the parties with a good living during the parties’ marriage. The husband testified, however, that, due to a poor economy, sales in the business had declined 50-60% and that it will be virtually impossible to keep the business operating absent an increase in sales or unless the business obtains relief from some of its debt. The accountant also testified that the business is “cutting it too close” to be considered an ongoing, long-term viable business. He testified that, if it takes six months or a year for the economy to recover, he did not see how the business could survive the way it was going. The wife testified that she wanted periodic alimony in the amount of her previous salary and “draws” from the business.
Based on the foregoing evidence, we cannot conclude that the trial court exceeded its discretion in dividing the parties’ property and declining to award the wife alimony. The evidence is clear that *1285 the wife is relatively young and capable of working. She received the majority of the marital property. Further, although the parties had been able to earn a sizeable income from the business, which the husband was awarded in the divorce judgment, it was clear that the business was performing poorly at the time of the trial and that it may not even survive. The trial court obviously, and correctly, took those facts into consideration in rendering the property division and alimony portions of its judgment.
III.
The wife last argues that the trial court exceeded its discretion in declining to reserve the right to award her periodic alimony in the future. “The trial court should reserve jurisdiction over the issue of alimony if the facts indicate that future circumstances may entitle either party to a later award of alimony.” Williams v. Williams, 905 So.2d 820, 828 (Ala.Civ.App.2004). “The failure either to award periodic alimony or to reserve the right to award periodic alimony at a later date precludes a trial court from later awarding periodic alimony.” McClellan v. McClellan, 959 So.2d 658, 664 (Ala.Civ. App.2006).
In Williams, this court reversed a trial court’s judgment for failing to reserve the issue of periodic alimony when the “evidence indicate[d] that, as a farmer, the husband’s income [was] likely to vary considerably from year to year, and may increase substantially, while the evidence tendfed] to indicate that the wife’s income [would] not increase substantially.” 905 So.2d at 828-29 (footnote omitted). Similarly, in the present case, the parties had enjoyed a high standard of living as a result of their working together in the business. Although the evidence indicated that the business had recently done poorly due to a slow economy, the evidence indicated that, if the economy improved, the husband could revive the business. Thus, like the husband’s income in Williams, the husband’s income in the present case may increase substantially. Considering the length of the parties’ marriage and the fact that the husband admitted that the wife had been an important part of the business, we conclude that the trial court erred in declining to reserve the right to award the wife periodic alimony in the future.

Conclusion

Based on the foregoing, we reverse the trial court’s judgment to the extent that it declined to reserve the right to award the wife periodic alimony in the future. We affirm the trial court’s judgment in all other respects. The cause is remanded for the entry of a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., concurs.
PITTMAN and BRYAN, JJ., concur in the result, without writings.
THOMAS, J., dissents, with writing.

. The quoted material is taken from the wife’s "Statement of Issues" in her brief to this court. In the "Summary of the Argument" and in the main body of her argument in her brief to this court, the wife also contends, alternatively, that the trial court valued the property in a manner inconsistent with this court’s holding in Shewbart v. Shewbart, 19 So.3d 223, 232 (Ala.Civ.App.2009) (reversing a trial court’s judgment because the trial court valued the sole proprietorship based solely on the worth of the materials owned and used in the business). The wife, however, did not raise that issue before the trial court. Therefore, she may not assert that argument for the first time on appeal. State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 821 (Ala.2005). Hence, we do not consider, as the dissent improperly does, whether the wife has been "denied her interest in any future income generated” by the business. 58 So.3d at 1289 (Thomas, J., dissenting).

. Section 2 of Article XII of the operating agreement provides, in pertinent part: "Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article is null and void ab initio.” In her postjudgment motion filed with the trial court, the wife argued, based in part on the foregoing provision, that the trial court could not dispose of her membership interest in the business at all. On appeal, however, the wife has abandoned that position entirely. The wife does not argue that the trial court erred in divesting her of her membership interest. When no argument is contained in an appellate brief, that argument is considered waived. Brewer v. Bradley, 431 So.2d 544, 546 (Ala.Civ.App.1983). Hence, the wife has waived any claim that § 2 of Article XII, or any other provision of the operating agreement for that matter, prohibited the trial court from disposing of her interest in the business. See Mullins v. Mullins, 416 So.2d 1063 (Ala.Civ.App.1982).
Despite the fact that a trial court’s authority to dissociate a member of an LLC is not even an issue in this appeal, the dissent attempts to fault this court for "failing] to explain by what right a trial court can dissociate a member of an LLC.” 58 So.3d at 1286 (Thomas, J., dissenting). Although not necessary for a resolution of the issues on appeal, to respond to the dissent, we note that Alabama law holds that, in equitably dividing marital property in a divorce action, a trial court may order one or both parties to convey an interest in a jointly owned business. See Mosley v. Builders South, Inc., 41 So.3d 806, 812-13 (Ala.Civ.App.2010); and TenEyck v. TenEyck, 885 So.2d 146, 154 (Ala.Civ.App.2003).

. In her brief to this court, the wife states that "it cannot be argued that the end result of the trial court's judgment was an involuntary dissociation of the [w]ife in the parties’ L.L.C.” Despite the wife’s clear position on that point, the dissent claims there is some "confusion” as to the wife’s argument on appeal. 58 So.3d at 1287 n. 11 (Thomas, J., dissenting). To clarify, the wife does not contend at any point in her brief that § 1.5 applies because she "desired” that the husband buy her interest in the business, as the dissent argues at length. 58 So.3d at 1288 (Thomas, J., dissenting). The wife obviously recognized that that argument would be disingenuous. At trial, the wife clearly testified that she desired to continue operating the business jointly with the husband. At that time, the wife did not, in fact, "desire to gift, sell, or otherwise convey” her interest in the business to the husband. In its judgment, the trial court plainly stated that it was ordering the wife to divest herself of her interest in the business against her stated desire to continue running the business with the husband. It is not the function of an appellate court to advocate a position on behalf of an appellant, Schiesz v. Schiesz, 941 So.2d 279, 289 (Ala.Civ.App.2006), especially one that is inconsistent with the facts of the case as found by the trial court and one that is in direct conflict with the position of the appellant.

. The dissent suggests that the court should read such a general provision into the operating agreement because it would be "unduly burdensome” “on the parties, during the formation of an LLC, to explicitly provide for every scenario in which an interest in an LLC may be disposed.” 58 So.3d at 1286 (Thomas, J., dissenting). However, the dissent cites no legal authority to support the proposition that a court can add terms to a contract on the ground that it would have been difficult for the parties to have originally included those terms. Regardless of the difficulty the parties hypothetically could have encountered in drafting a more comprehensive operating agreement, the fact remains that the operating agreement simply does not contain any provision, general or specific, that requires the valuation procedure set out in § 2.2 to be used in the event of an involuntary dissociation pursuant to the terms of a divorce judgment. We cannot ignore the actual terms of the operating agreement and arbitrarily interfere with the contractual rights of the parties by adding such a provision into the operating agreement.

. The dissent claims this court is "rewriting the operating agreement.” 58 So.3d at 1285 (Thomas, J., dissenting). In actuality, it is the dissent that attempts to rewrite the operating agreement to include a provision that would require the valuation procedure contained in § 2.2 to apply to an involuntary dissociation due to divorce when no such provision exists. This court is simply enforcing the operating agreement as written and not incorporating any terms that would allow the valuation procedure set out in § 2.2 to apply to a situation not addressed in the operating agreement, either generally or specifically. In so doing, this court does not, as the hyperbole of the dissent maintains, create "dangerous precedent [that] represents an affront to the principles of contract law in Alabama ... [and] ... upend[s] a legal foundation of business development in Alabama.” 58 So.3d at 1285 (Thomas, J., dissenting). In this opinion, the court merely properly observes the well-settled law that courts cannot create new contracts for the parties, as the dissent would have us do. See Title Max of Birmingham, Inc. v. Edwards, 973 So.2d 1050, 1055 n. 1 (Ala.2007) ("[T]he Constitution of Alabama prohibits this Court from substituting its 'belief' as to what one of the parties did or did not intend for the express terms to which both parties agreed in a contract and thereby impairing the obligation of contracts.”).

. The dissent suggests that this court is basing its decision on a contractual interpretation the trial court did not consider. 58 So.3d at 1287 (Thomas, J., dissenting). We note that the trial court did not set forth any specific reason why it declined to follow the valuation procedure in § 2.2, and we recognize that it may have rested its decision on the same basis as this court. However, even if the trial court did not consider the ground relied upon in this opinion, " ‘[t]his [c]ourt may affirm a trial court's judgment on "any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court.” ’ ” Unum Life Ins. Co. of America v. Wright, 897 So.2d 1059, 1082 (Ala.2004) (quoting General Motors Corp. v. Stokes Chevrolet, Inc., 885 So.2d 119, 124 (Ala.2003), quoting in turn Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003)). The validity of the ground relied upon in this opinion does not in any way depend on how the parties may or may not have interpreted the operating agreement at trial, as the dissent suggests, 58 So.3d at 1287 n. 11, because the meaning of an unambiguous contract is purely a question of law for the court. Vainrib v. Downey, 565 So.2d 647, 648 (Ala.Civ.App.1990).

.Because we decide the issue on the foregoing ground, we do not decide the question whether the trial court would have been bound by the terms of the operating agreement had the agreement specifically provided a valuation procedure to be used in the event of a dissociation due to the divorce of one or more of the members.

. There was also evidence presented indicating that both parties had taken loans from the business. The accountant testified that, if they elected not to pay the loans back, they would have to pay income taxes on the amount of those loans. The wife does not argue that she is required to pay back her loan. Further, there is no evidence regarding the amount of tax that she would owe; thus, we decline to take into account the amount of tax in our analysis.

. We only considered the property for which there was evidence regarding the value of the property.