937 So.2d 535 (2006)
D.B.
v.
MADISON COUNTY DEPARTMENT OF HUMAN RESOURCES.
2040919.
Court of Civil Appeals of Alabama.
February 24, 2006.
*536 William G. Werdehoff of Werdehoff & Werdehoff, Huntsville, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
PER CURIAM.
D.B. ("the mother") appeals from a judgment following a permanency hearing in a dependency case wherein the juvenile court awarded legal and physical custody of D.M.B., the mother's six-year-old daughter, to the child's maternal great aunt in Ohio.
The mother has limited cognitive ability as well as various mental and emotional disorders. She has an IQ of 68; she suffers from bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), adjustment disorder, and dependent personality disorder. From the time of the child's birth on May 6, 1999, until July 2, 2004, the mother and the child lived with the child's maternal grandparents. In 2002, the maternal grandmother suffered two strokes and became partially disabled. In November 2003, the maternal grandfather was arrested for assaulting the mother. In February 2004, after committing another incident of domestic violence against the mother, the maternal grandfather was convicted of assault and incarcerated. While he was in jail, he suffered a stroke and was hospitalized. Upon his release from the hospital, he returned home and was bedridden.
On July 2, 2004, the maternal grandfather fell out of bed. When the mother and a home-health nurse were unable to move the maternal grandfather, they summoned emergency medical personnel. After the medical personnel arrived, the mother became belligerent and threatened the home-health nurse. The nurse notified the Madison County Department of Human Resources ("DHR") of the mother's erratic behavior. The mother was subsequently admitted to the psychiatric ward at North Alabama Regional Hospital ("NARH"), and the child was placed in foster care.
Before the mother was released from NARH, the maternal grandparents were taken to Ohio, where the grandfather subsequently died and the grandmother was placed in a nursing home. After the mother was released from NARH, she spent a short time in a shelter and then rented a one-bedroom apartment. At trial, the mother acknowledged that she had been asked to leave that apartment because she was "having sex with Mexicans for money."
The mother is 32 years old and unemployed; she receives Supplemental Security Income in the amount of $579 per month. That income is sent to a payee at Adult Rehabilitation Services; the payee makes the mother's monthly rent and utilities payments and remits the balance, usually *537 about $20 per month, to the mother. The mother testified that her telephone service had been cut off every month and that she had to beg the payee to pay the bill. The mother said that she receives food stamps and occasional meals from "people at the church." The mother stated that she had attempted to cook for the child when they were living with the maternal grandparents. She testified that she had tried to make ramen noodles and "other things." She stated that the child would not eat what she made for breakfast, so she would take the child to a McDonald's fast-food restaurant on the way to school in the morning.
The mother rented another apartment and began receiving the following services from DHR: transportation; mental-health counseling; monitoring; and supervision. She underwent a psychological evaluation and began taking Depakote and Zoloft as prescribed by her psychiatrist. She completed a parenting course and had five hours' weekly visitation with the child. The mother acknowledged that, during her visits with the child, the child seemed to be afraid of her, was reluctant to hug her, and would not call her "mother."
As of November 2004, DHR's permanency plan was to reunite the mother and the child because the mother was cooperating with DHR and complying with the goals outlined in her Individualized Service Plan ("ISP"). DHR's permanency plan for the child gradually changed, however, and shortly after a February 8, 2005, ISP meeting DHR determined to place the child with relatives in Ohio.
Between November 2004 and February 2005, the mother had met a man, J., on the telephone and, after talking with him for 20 minutes, had invited him to move in with her. J., who had apparently been homeless, moved in with the mother and later asked his "girlfriend," N., who was also apparently homeless, to join him in living at the mother's apartment. The mother also took in a stray cat, three birds, and a hamster.
Alice Averette, the mother's DHR social worker, testified that she had asked the mother to insist that J. and N. leave because, she said, the mother had barely enough income to cover her own needs without two additional people living with her. The mother acknowledged that J. was a "moocher" who ate her food, contributed nothing to the household, and stole things from her, but she refused to ask him to leave, stating that she was lonely and he was company for her. The mother also said that she liked N. because N. helped her cook, clean, and shop. She said that she liked to buy snack foods like chips and doughnuts and, she stated, without N.'s assistance at the grocery store, she would not have nourishing meals. The mother admitted that she had smoked marijuana with J. and N. and that she had failed a drug screen.
Averette testified that she had advised the mother that an unvaccinated stray cat could be dangerous but that the mother was unresponsive. When Averette commented to the mother that the apartment reeked of animal excrement, the mother said that she could not afford cat litter. Averette insisted that the mother get rid of the pets, but the mother refused, stating that she would be lonely without them.
Averette testified that between November 2004 and February 2005 she learned that the mother had stopped taking her medication and had discontinued her psychological counseling sessions. In response to Averette's request that the mother have a physical examination, the mother learned that she had gonorrhea. The mother said she had contracted the disease from "Red," a man with red hair whose last name she did not know. Averette *538 explained that the mother's previously cooperative attitude had changed, and she concluded that DHR would no longer plan for reunification but would plan to have the child placed with relatives in Ohio.
Averette stated that she had attempted to locate relatives in Madison County but had found none. She contacted the child's alleged father, who stated that he wanted nothing to do with the mother or the child. According to Averette, the alleged father explained that he was still undergoing counseling as a consequence of the sexual encounter between him and the mother, an encounter that he described as a "rape" by the mother when he was 14 or 15 years old and the mother was 26 years old. Averette said that the child's maternal great aunt, who was a licensed foster parent in Ohio with no other children in the home, was willing to assume custody of the child.
By the time of the permanency hearing on May 31, 2005, the mother had had the cat vaccinated, had demanded that J. and N. leave the apartment, had resumed taking her medication, had passed a drug screen, and was participating in an anger-management program. The psychiatrist who had treated the mother at NARH in July 2004 testified that she saw no reason why the mother's bipolar disorder or ADHD would prevent her from being a good parent. The psychiatrist acknowledged, however, that she had not seen the mother since her hospitalization at NARH and that she had no idea how the mother was adapting to living on her own.
On June 4, 2005, the juvenile court entered a judgment that states, in pertinent part:
"The matter was originally before Juvenile Court of Madison County on the Petition of the Madison County [DHR]. This cause came to be heard for a permanency hearing on May 13, 2005. The Madison County [DHR] recommended that the Court adopt Permanent Relative Placement with Transfer of Custody to a Relative as the permanent plan for the care and placement of the minor child [D.M.B.]. After consideration of the stated permanency plan, the mother objected and requested the matter be scheduled for an evidentiary hearing.
"Based on the testimony presented, the Court finds the following facts:
"1. The above-named child remains a dependent child.
"2. The best interests of the child require the entry of this order.
"3. The Court finds, in accordance with Code of Alabama 1975, § 12-15-65(g), that reasonable efforts have been made to prevent or eliminate the removal of the child from the child's home, and that return of the child to the home would be contrary to and not in the child's best interests.
"4. On recommendation of the Madison County [DHR], the Court adopts, as the permanent plan for the child, Permanent Relative Placement with Transfer of Custody to Relative. Efforts made by the [DHR] following the placement of the above-named child into foster care were reasonable to finalize the stated permanency plan of Permanent Relative Placement with Transfer of Custody to Relative.
"It is therefore ordered, adjudged, and decreed by the Court as follows:
"A. Physical and legal custody of the minor child [D.M.B.] (d.o.b. 5/6/99) is hereby vested with the maternal great aunt, [J.B.]
"B. The mother, [D.B.], is granted visitation subject to any conditions and limitations determined to be necessary and appropriate by [J.B.]
"C. The provision for child custody in this Order constitutes a `custody *539 decree' or `custody determination' under Alabama enactment of the Uniform Child Custody Jurisdiction and Enforcement Act, § 30-3B-101, et seq., Code of Alabama (1975).
"D. This matter is closed to further Court intervention."
In response to the mother's postjudgment motion, the trial court amended its judgment to allow the child's maternal great aunt "to determine if and when visits may be appropriate in Ohio with a two week advance notice by the mother. No phone contact." The mother appeals, raising three issues: (1) that the juvenile court erred in determining that DHR had made reasonable efforts toward reunification of the mother and the child; (2) that the evidence was insufficient to demonstrate that a transfer of custody to the child's maternal great aunt in Ohio was in the best interest of the child; and (3) that the juvenile court exceeded the limits of its discretion by leaving the issue of visitation solely to the determination of the maternal great aunt.

Applicable Law
The statutory authority for holding a "permanency hearing" is found in § 12-15-62(c), Ala.Code 1975. That section provides, in pertinent part:
"Within 12 months of any court order placing a child in foster care the court shall hold a permanency hearing. The Department of Human Resources shall present to the court at such hearing a permanent plan for said child. If a permanent plan is not presented to the court at this hearing there shall be a rebuttable presumption that the child should be returned to the family. This provision is intended to insure that a permanent plan is prepared by the Department of Human Resources and presented to the court within 12 months of the placement of any child in foster care. The purpose of the permanency hearing shall be to determine the permanency plan for the child which may include whether, and, if applicable, when, the child shall be (i) returned to the parent, (ii) placed for adoption wherein the Department of Human Resources shall file a petition for termination of parental rights, or (iii) referred for legal custody. The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian."
Section 12-15-65(g), Ala.Code 1975, provides:
"If the court enters an order ... continuing a child in a placement outside of his or her home pursuant to this title, the order shall contain as specific findings, if warranted by the evidence, all of the following:
"(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
"(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home ....
"(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed."

*540 "Reasonable Efforts"

The mother argues that the juvenile court erred in concluding that DHR had made reasonable efforts to reunite the mother and the child but that those efforts had failed. Specifically, the mother contends that DHR made reunification efforts for only seven monthsfrom July 2004 through February 2005and then abruptly discontinued those efforts simply because she would not ask two friends to leave her apartment or have a stray cat vaccinated. The mother claims that DHR's decision was arbitrary and that its efforts were, therefore, unreasonable.
The juvenile court was authorized to conclude that DHR made the decision to change its permanency plan based upon factors in addition to those the mother enumerates, namely: information that the mother had used drugs, had discontinued taking her medication, and had stopped attending counseling sessions and information about the mother's past and current behavior that implied more than momentary lapses in good judgment and suggested, instead, that the mother suffered either from a profound inability to appreciate the possible adverse consequences of her behavior or from an impulsiveness that prevented hereven if she appreciated the potential consequences of certain behaviorfrom adjusting her behavior to avoid those consequences.
The mother's inability to appreciate the consequences of her behavior was demonstrated by her disregarding Averette's warning that it might be dangerous to herself or to a six-year-old child to ask a man whom the mother had just met to move in with her or to take in a stray cat without having it vaccinated. The mother's inability to adjust her behavior to appropriate norms despite an apparent appreciation of possible adverse consequences was demonstrated (1) by the mother's refusal to demand that J. leave, despite her acknowledgment that J. was a "moocher" and stole from her, and (2) by the mother's statement that she liked to buy snack foods like chips and doughnuts and that, without N.'s assistance at the grocery store, she would not have nourishing meals.
Based on the foregoing, we conclude that the juvenile court did not err in its conclusion "that reasonable efforts ha[d] been made to prevent or eliminate the removal of the child from the child's home."[1]

"Best Interests"
The mother asserts that there was no evidence presented from which the juvenile court could have found that placement with the child's maternal great aunt in Ohio was better for the child than leaving her in foster care in the same city as the mother. The mother points out that there was no evidence presented regarding the maternal great aunt other than evidence of the fact that she and her husband were "preapproved as licensed foster parents," that they had seen the child in August 2004, that they had talked to the child on the telephone, and that they probably would not promote a relationship between *541 the mother and the child if they were awarded custody.
The juvenile court was authorized to find that, having met the licensing requirements for foster parents, the maternal great aunt and her husband were fit to raise a child. Moreover, it was further authorized to find that, because the maternal great aunt and her husband were willing to assume permanent custody and had visited the child and talked to her on the telephone after she was placed in foster care, they had a commitment to the child arising either from affection or kinship. Finally, the juvenile court is presumed to be cognizant of the public policy expressed in § 12-15-62(c), Ala.Code 1975, that a child should not languish in foster care longer than 12 months without a plan for her permanent placement. See generally R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997), affirmed, 145 F.3d 363 (11th Cir.1998).
In contrast, the mother's past and present sexual conductincluding an apparently predatory sexual encounter with a 14- or 15-year-old boy, "having sex with Mexicans for money," and contracting gonorrhea from a man whose last name she did not knowpresented not only a negative role model for the child but a real potential for harm to the child.
The evidence was sufficient for the juvenile court to find that the child's best interests would be served by transferring custody to the child's maternal great aunt in Ohio.

Visitation
The mother asserts that the juvenile court exceeded its discretion by making her visitation with the child "subject to any conditions and limitations determined to be necessary and appropriate by [the maternal great aunt]." The mother strenuously objects to the provision prohibiting her from telephone contact with the child, arguing that there was no evidence tending to support the prohibition of telephonic communication. In response, DHR argues (1) that the Alabama juvenile court would have no jurisdiction to enforce any visitation provisions regarding a child who is a resident of Ohio, (2) that, "given the mother's display of impaired judgment, the child's permanency, stability and best interest could be jeopardized by unfettered contact with the mother," and (3) that the evidence supported the inference that, because the mother's telephone service had been cut off every month, she must have had large telephone bills.
"`The determination of proper visitation... is within the sound discretion of the trial court, and that court's determination should not be reversed by an appellate court absent a showing of an abuse of discretion.' Ex parte Bland, 796 So.2d [340] at 343 [(Ala.2000)]. `The primary consideration in setting visitation rights is the best interest of the child. Each child visitation case must be decided on its own facts and circumstances.' DuBois v. DuBois, 714 So.2d 308, 309 (Ala.Civ.App.1998) (citation omitted)."
Williams v. Williams, 905 So.2d 820, 830 (Ala.Civ.App.2004).
Although this court recognizes that visitation is a matter left to the sound discretion of the trial court, it also recognizes that such discretion is not unfettered. This court has previously held that it is reversible error for a trial court to leave a noncustodial parent's visitation rights with his or her child to the discretion of the custodial parent or other legal custodian of the child. See, e.g., L.L.M. v. S.F., 919 So.2d 307 (Ala.Civ.App.2005) (reversing a juvenile court's visitation award, which placed the father in control of the mother's visitation with the child); K.B. v. Cleburne *542 County Dep't of Human Res., 897 So.2d 379 (Ala.Civ.App.2004) (reversing a juvenile court's visitation award, which essentially left the mother's right to visitation with the child to the discretion of the child's aunt and uncle); K.L.U. v. M.C., 809 So.2d 837 (Ala.Civ.App.2001) (reversing a trial court's visitation award, which allowed the mother to determine the father's visitation schedule); and Bryant v. Bryant, 739 So.2d 53 (Ala.Civ.App.1999) (reversing a trial court's visitation award, which vested the mother with total discretion to determine the father's visitation rights). Given the authority of L.L.M. v. S.F., supra; K.B. v. Cleburne County Dep't of Human Res., supra; K.L.U. v. M.C., supra; and Bryant v. Bryant, supra, the juvenile court erred in failing to set forth a specific visitation schedule. Because the mother's parental rights have not been terminated, she retains the following rights, designated as "residual parental rights" in § 12-15-1(24), Ala.Code 1975:
"Those rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, including, but not necessarily limited to, the right of visitation, the right to consent to adoption, the right to determine religious affiliation, and the responsibility for support."
(Emphasis added.)
The mother is correct that there was no evidence to support the absolute prohibition of telephone contact with the child. Thus, we hold that the juvenile court exceeded the limits of its discretion in barring all telephonic communication between the mother and the child.
The judgment is affirmed in all respects except for the provisions regarding visitation. The cause is remanded with instructions to set forth a specific visitation schedule for the mother and to provide for reasonable telephone contact between the mother and the child.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, P.J., and PITTMAN, J., concur.
THOMPSON, J., concurs in the result, with writing.
MURDOCK, J., dissents, with writing, which BRYAN, J., joins.
THOMPSON, Judge, concurring in the result.
I concur in the result and write separately to note that, in light of the record before us, I would recommend that the juvenile court consider whether the visitation should be supervised and whether the telephone visitation should be monitored.
MURDOCK, Judge, dissenting.
I would be inclined to concur in the main opinion were it not for my concern that the juvenile court had no evidence before it regarding the child's maternal great aunt other than that she had been "preapproved as a licensed foster parent." That bare fact would appear to be inadequate as a basis for a determination that the child's interests would be best served by placement of the child in the custody of the maternal great aunt as opposed to some other alternative. While it may be true that a child should not languish in foster care, and while it may be true as well that the mother in this case should not be the custodian for this child, that does not authorize the juvenile court to award custody to any other party. In my opinion, the juvenile court erred to reversal in placing permanent custody of the child with an adult about whom the juvenile court had *543 virtually no information.[2] I therefore respectfully dissent; I would remand this case for further proceedings.
BRYAN, J., concurs.
NOTES
[1] Although the parties disagree as to whether the juvenile court's "reasonable efforts" determination was governed by a "clear and convincing evidence" standard or a "preponderance of the evidence" standard, we do not find it necessary to decide this issue given the record before us, the posture in which this case is presented on appeal, and the fact that a decision on this issue would not affect the outcome of this appeal. The record contains evidence sufficient to support a determination that DHR had made "reasonable efforts" based on either standard. Further, the mother did not argue at trial and does not argue on appeal that the juvenile court applied the wrong standard so as to require a remand.
[2] In fact, the only other evidence concerning the child's Ohio relatives and the mother was that there was not a good relationship between them and that the Ohio relatives likely would not promote a relationship between the mother and the child if they had custody of the child. Indeed, the DHR social worker even told the mother that she would probably not see her child again until the child reached the age of majority and came looking for her mother. By comparison, the evidence showed that the child was doing well in her current placement. The child was performing well in kindergarten, getting along well with other students, and participating fully in all other aspects of the kindergarten program. The child has a good vocabulary. Further, she went to visits voluntarily and she and the mother were affectionate with one another.