THOMAS, Judge.,
In July-2013, the Jefferson County Department of Human Resources (“DHR”) filed a dependency petition in the Jefferson Juvenile Court in which it sought custody of R.C.R., a two-year-old child who had been found wandering in the street unsupervised. On July 10, 2013, the juvenile court entered a an order in which it specified that A.R. (“the mother”) had admitted to the child’s dependency and placed the child in the custody of S.D., the child’s aunt (“the aunt”). M.C. (“the father”) was listed in that order as the putative father of the child; he was awarded supervised visitation.
The father established his paternity in September 2013, and, in October 2013, the juvenile court entered a dispositional order that maintained custody of the child in the aunt, ordered the parents to complete certain classes, and awarded the parents supervised visitation as agreed to by the parties.’ The juvenile court entered another dispositional order in May 2014, which did not change the ¡custodian or alter the visitation provisions of the earlier orders. In August 2014, however, the juvenile court entered a dispositional order awarding the father unsupervised daytime visitation; the order did not specify the day, time, or length of the visitation awarded to the father. The August 2014 order also required that the mother’s visitation be supervised by the aunt or by the father.
On February 4, 2015, the juvenile court entered a dispositional judgment awarding the father unsupervised daytime visitation and supervised overnight visitation; the juvenile court also closed the case to further review. According to the February *520 2015 judgment, the father’s overnight visitation is required to take place at the residence of L.C., the child’s paternal grandfather (“the grandfather”), with whom the father lived at the time of the January 2015 dispositional trial. The father filed a timely postjudgment motion, which was denied by operation of law. He then filed a timely notice of appeal.
The father seeks our review of the visitation aspects of the juvenile court’s February 2015 judgment. He specifically complains that the February 2015 judgment fails to award visitation at specified times and that the evidence adduced at trial does not support the requirement that his overnight visitation be supervised. DHR concedes that the daytime-visitation provision of the February 2015 judgment must be reversed so that the juvenile court can set out a specific visitation schedule for the father. However, DHR contends that the juvenile court properly required that the father’s overnight visitation be supervised, and DHR requests that this court affirm that aspect of the February 2015 judgment.
By now it is well settled that a visitation order that does not specify the dates and times of visitation and instead leaves visitation to the discretion of the custodian is reversible. P.D. v. S.S., 67 So.3d 128 (Ala.Civ.App.2011); A.M.B. v. R.B.B., 4 So.3d 468, 471-72 (Ala.Civ.App.2007).
“[T]he determination of proper visitation ““‘is within the sound discretion of the trial court, and that court’s determination should not be reversed by an appellate court absent a showing of an abuse of discretion.” Ex parte Bland, 796 So.2d [340] at 343 [ (Ala.2000) ]. “The primary consideration in setting visitation rights is the best interest of the child. Each child visitation case must be decided on its own facts and circumstances.” DuBois v. DuBois, 714 So.2d 308, 309 (Ala.Civ.App.1998) (citation omitted).’
“Williams v. Williams, 905 So.2d 820, 830 (Ala.Civ.App.2004).
“Although this court recognizes that visitation is a matter left to the sound discretion of the trial court, such discretion is not unbounded. This court has previously held that it is reversible error for a juvenile court to leave the matter of a noncustodial parent’s visitation rights to the sole discretion of a custodial parent or other legal custodian of the child. See, e.g., L.L.M. v. S.F., 919 So.2d 307 (Ala.Civ.App.2005) (reversing a juvenile court’s visitation award that placed the father in control of the mother’s visitation with the child), and K.B. v. Cleburne County Dep’t of Human Res., 897 So.2d 379 (Ala.Civ.App.2004) (reversing a juvenile court’s visitation award that essentially conditioned the mother’s right to visitation with her child upon the consent of the child’s aunt and uncle); see also D.B. v. Madison County Dep’t of Human Res., 937 So.2d 535, 541 (Ala.Civ.App.2006) (plurality opinion reversing a juvenile court’s judgment that made the mother’s visitation ‘“subject to any conditions and limitations deemed to be necessary and appropriate” ’ by the child’s great aunt, who was awarded custody of the child).”
A.M.B., 4 So.3d at 471-72.
The February 2015 judgment does not specifically leave the father’s visitation rights to the discretion of the aunt; however, the juvenile court’s failure to specify the day, the frequency, and the length of time of the father’s visitation leaves the father and the aunt without guidance regarding visitation, which would likely lead to the aunt’s having the power to control visitation until further litigation occurs. As noted, DHR concedes that the juvenile *521 court erred in not setting out a specific visitation schedule. We therefore reverse the February 2015 judgment insofar as it fails to set out a specific visitation schedule, and we remand the cause with instructions to the juvenile court for it set out a specific visitation schedule for the father.
We turn now to the father’s argument that the juvenile court' lacked sufficient evidence to order that his overnight visitation with the child be supervised. The transcript contains testimony from only two witnesses: • Kheona Hayes, the DHR caseworker assigned to the child’s case, and the aunt. The father did not testify.
Hayes testified that, at one point, the father had been allowed to supervise the child’s visits with the mother. She recounted an incident during which the father had allowed the child to visit with the mother despite the fact that he had been concerned that the mother was “off her medication”;[1] Hayes testified that the father had informed her of his concerns about the mother. However, the record does not indicate' that the child suffered any distress or danger by being exposed to the mother during her court-ordered visitation. Further, we note that, although Hayes appeared to fault the father for not unilaterally denying the mother visitation when he suspected that the mother was not on her medication, the order allowing the father to supervise the mother’s visitation does not contain a provision indicating that the visitation supervisor could.deny visitation to the mother. Hayes indicated concern that the father would not be able to keep the child away from the mother, which, according to Hayes, the father had readily admitted; the record contains no evidence, however, indicating that the father had ever left the child alone with the mother or had otherwise disobeyed the court order requiring that the • mother’s visitation be supervised.- Hayes also noted that the parents had had a history of domestic violence.
In addition, Hayes said that, in her opinion, the father had failed to establish a stable residence because he had been living with the grandfather for approximately one year; Hayes explained that the father’s residence was not stable because the father had no lease granting him any legal right to remain in the residence and, therefore, the grandfather could make the father leave at any time. According to Hayes, the father had' informed her that he intended to rent a house “on the lake.” Hayes said that she had concerns about the father’s having visitation with the child in a home that DHR had not inspected.
Hayes further complained about the father’s apparent reluctance to take a drug test until he was ordered to do so by the juvenile court; the request that the father take the drug test was apparently prompted by the mother’s accusation that the father was using drugs. The father passed the drug test that he took. Hayes stated that her 'recommendation was to allow the father to have unsupervised visits during the daytime and overnight visits at the grandfather’s home.
The aunt testified that she agreed with Hayes that the father should have urisu-pervised visitation during the daytime. However, she stated that she desired that his overnight visitation be supervised by the grandfather at the grandfather’s home. According to the aunt, she was concerned that the mother, after she was. released from involuntary commitment, “might go *522 back and forth a'lot,” apparently indicating that the aunt believed that the mother might spend time at the father’s residence. She also voiced concerns over the parents’ “on again/off again” relationship; she said that she was “not saying they physically fight” but that they would “scream and yell” if they had a disagreement, even in the presence of the child. The aunt further testified that she did not trust the father’s decision-making ability because, she said, “history says he will change his mind on a dime.” As proof of the father’s poor decision-making ability, the aunt testified that the father had left a visitation with the child early because the mother had telephoned him when she needed transportation. Overall, the aunt seemed concerned that the father still had contact with the mother.
The father argues that the evidence at trial does not indicate why, if he is able to adequately supervise and parent his child unsupervised during the daytime, he cannot also do the same at an overnight visit. The father admits that a juvenile court may restrict a parent’s visitation rights.
“[Visitation] rights may be restricted in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that, endanger the children’s health, safety, or well-being. See Ex parte Thompson, 51 So.3d 265, 272 (Ala.2010) (‘A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, sét conditions on visitation that protect the child.’). In fashioning the appropriate restrictions, out Of respect for the public policy encouraging interaction between noncustodial parents and their children, see Ala.Code 1975, § 30-3-150 (addressing joint custody), and § 30-3-160 (addressing Alabama Parent-Child Relationship Protection Act), the trial court may not use an overbroad restriction that does more than necessary to protect the children. See Smith v. Smith, 887 So.2d 257 (Ala.Civ.App.2003), and Smith v. Smith, 599 So.2d 1182, 1187 (Ala.Civ.App.1991).”
Pratt v. Pratt, 56 So.3d 638, 641 (Ala.Civ.App.2010). We note that this, court has explained that the standard governing visitation in dependency cases is the same as the standard governing visitation in divorce cases. K.D. v. Jefferson Cnty. Dep’t of Human Res., 88 So.3d 893, 897 (Ala.Civ.App.2012) (quoting R.B.O. v. Jefferson Cnty. Dep’t of Human Res., 70 So.3d 1286, 1289 (Ala.Civ.App.2011)).
The father urges us to conclude either that the evidence does not demonstrate a need to restrict his visitation with the child or that supervised visitation is overly restrictive in the present case and that the apparent concerns of DHR and the aunt may be alleviated in other ways. He notes that the juvenile court had other, less restrictive options available to address any of DHR’s or the aunt’s concerns. For example, the father points out that the juvenile court could have restricted him from exercising visitation with the child in the presence of the mother.
' In response, DHR argues that the juvenile court had sufficient evidence from which to conclude that supervision of the father’s overnight visitation was warranted. DHR contends that the evidence presented at trial proved that the father did not have the ability to protect the child from the mother.[2] Further, DHR con *523 tends that the evidence presented at trial established a concern that the mother will return to live with the father once she is released from her term of commitment. DHR also cites to the evidence demonstrating that the mother and the father have had a history of domestic violence, which, DHR says,- if the mother and the father resume living together, would be likely to be repeated. In addition, DHR notes that the father had indicated that he intended to move into his own residence and out of the grandfather’s residence shortly after the trial; DHR points out that it has not had an opportunity to inspect the father’s intended dwelling and to determine whether it is safe for the child. Finally, DHR states that the evidence presented at trial “supports a conclusion”- that the father abuses drugs; DHR’s brief indulges in speculation at this point, stating that the father’s failure to take the drug test when first requested by Hayes likely permitted him additional time to ensure his drug test would be negative. Based on all of these facts, DHR contends, the juvenile court had ample evidence to conclude that supervision of the father’s overnight visits was necessary.
We cannot agree with DHR. The “facts” that, according to DHR, necessitate that the father’s overnight visitation be supervised would, under DHR’s reasoning, also necessitate that the father’s daytime visitation be similarly restricted. DHR and the aunt agreed on the record that the father’s daytime visitation should not be supervised, despite the fact that such unsupervised visitation does not specifically restrict the father from having contact with the mother or from taking the child to a place other, than the grandfather’s house during daytime visitation.
Other than a vague, unproven allegation that the father abuses drugs, which was made by the'mentally ill-mother, 'nothing in the record indicates that - the father abuses drugs or has exposed the child to any danger whatsoever, other than, perhaps, allowing the child to be around the mother when she was off of her medication at one visit that the father supervised, as had been required by a previous order. The only reasonable argument against allowing the father unfettered overnight visitation might be that DHR has not had an opportunity to inspect the new residence the father was planning to obtain, but that issue could easily be addressed by requiring the father to seek DHR’s approval of any new residence before allowing overnight visitation with the child at that residence.
None of the “facts” upon which DHR relies indicate that the time of day would make a difference in the father’s ability to care for and protect the child. Furthermore, as the father argues, lesser restrictions on the father’s overnight visitation, like a restriction that the father not be permitted to have visitation with the child in the presence of the mother, could alleviate any concern that the child would be exposed to the mother upon her release from commitment. Based on the evidence of record, the requirement that the father’s overnight visitation be supervised is “an overbroad restriction that does more than necessary to protect the child[ ].” Pratt, 56 So.3d at 641. We see no indication that the father has abused the child or otherwise has placed her in danger such that his visitation with the child should be supervised. See P.D. v. S.S., 67 So.3d 128, 136 (Ala.Civ.App.2011) (reversing an award of supervised visitation based on the “lack of evidence indicating that the mother had ever abused the children or had placed the children in harm’s way”). Ac *524 cordingly, we reverse the February 2015 judgment insofar as it requires that the father’s overnight visitation be supervised.
Our review of the father’s arguments on appeal has convinced us that the visitation provisions of the juvenile court’s February 2015 judgment were entered in error. We therefore reverse the juvenile court’s February 2015 judgment insofar as it addresses the father’s visitation, and we remand the cause to the juvenile court for it to enter a judgment setting out a specific visitation schedule for the father.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN and MOORE, JJ., concur.
THOMPSON, P.J., and DONALDSON, J., concur in the result, without writings.

. The record indicates that the mother suffers from some form of mental illness and that, at the time of the dispositional trial, she had been involuntarily committed for mental-health treatment.

. No testimony indicated why the mother posed a danger to the child, but the initial reason the child was taken into custody indi *523 cates that the mother was neglectful of the child.