REL:  January 13, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

———————————————

## CL-2022-0644

———————————————

## A.E.

## v.

## Madison County Department of Human Resources

## Appeal from Madison Juvenile Court
## (JU-20-807.01)

EDWARDS, Judge.

In October 2020, the Madison County Department of Human Resources ("DHR") filed in the Madison Juvenile Court ("the juvenile court") an action seeking to have A.G. ("the child"), the child of V.G. ("the father") and A.E. ("the mother"), declared dependent.  In January 2021,

the juvenile court entered a judgment declaring the child dependent and ordering DHR to provide protective supervision over the child. The January 2021 judgment did not award legal or physical custody of the child to DHR or to any third party but instead granted DHR the discretion to determine the child's physical placement. In addition, the January 2021 judgment approved as concurrent permanency plans "return to parent" and "permanent relative placement."

In February 2021, after a permanency hearing, the juvenile court entered a permanency order again declaring the child dependent, "vesting" protective custody of the child with DHR, and permitting DHR to begin transitioning the child to placement in the home of the mother. The February 2021 permanency order did not award legal or physical custody of the child to DHR or to any third party. The February 2021 permanency order again approved the concurrent permanency plans of "return to parent" and "permanent relative placement."

In July 2021, the juvenile court entered a permanency order concluding that the child remained dependent and maintaining protective supervision over the child by DHR; again, the July 2021

permanency order failed to award legal or physical custody to DHR or to a third party. The July 2021 permanency order required DHR to provide reunification services to the father and to the mother. Like the permanency orders that preceded it, the July 2021 permanency order approved the concurrent permanency plans of "return to parent" and "permanent relative placement."

In October 2021, the juvenile court entered another permanency order declaring that the child remained dependent, ordering DHR to continue providing protective supervision of the child, and placing the child in the "physical care" of the paternal grandmother, C.P. ("the paternal grandmother"). The juvenile court again approved the concurrent permanency plans of "return to parent" and "permanent relative placement." The October 2021 permanency order also required DHR to continue to provide reunification services to the mother and to the father.

On February 4, 2022, the juvenile court entered a permanency order finding that the child remained dependent, ordering DHR to continue providing protective supervision, and ordering that the child

remain in the physical custody of the paternal grandmother. The February 4, 2022, permanency order adopted as the sole permanency plan "permanent relative placement." The February 4, 2022, permanency order did not address reunification services.

After a trial on February 15, 222, the juvenile court entered a judgment on March 14, 2022, awarding permanent custody of the child to the paternal grandmother and to the paternal grandfather, R.G. ("the paternal grandfather"). In the March 14, 2022, judgment, the juvenile court awarded the mother visitation "as arranged by the [paternal grandmother and the paternal grandfather] and supervised by [A.S., ('the maternal grandmother')] or other adult as agreed." The visitation provision of the March 14, 2022, judgment continues:

> "The mother shall be entitled to exercise not less than two (2) hours of visitation each calendar month with the child and may exercise additional visitation as agreed upon by the parties. In the event the parties are unable to agree upon a schedule of visitation or supervision of visitation, the mother shall exercise her visitation under the supervision of the Both Parents Program of the Family Service Center or similar professional service, at the mother's expense. If the parties cannot agree on a time, visitation will be on the first Saturday of the month from 1:00 until 3:00 p.m."

4

The March 14, 2022, judgment also awarded the father certain visitation rights. The mother filed a timely notice of appeal of the judgment; the father did not appeal.

The testimony taken at the February 15, 2022, trial encompasses only 79 pages. Nesha Green, the DHR caseworker assigned to the family in August 2021, testified that the child had been placed in the home of the paternal grandmother and the paternal grandfather for the entire time that she had served as the caseworker. Green indicated that the mother had completed a substance-abuse assessment, a psychological evaluation, and a program she referred to as "healthy families."

In addition, Green testified that the mother had engaged in supervised visits with the child and that the mother had also participated in color-code drug screening. Green testified that the mother's visitation with the child had "fluctuated up and down" and said that the mother had reportedly not been "as in tune with the child as she should have been." According to Green, the mother had, at times, tested positive on her drug screens, most recently on February 10, 2022, for marijuana.

Green said that the mother had failed to take a drug screen on February 14, 2022, the day before the trial.[1]

Green further explained that the mother had been diagnosed in a January 2022 psychological evaluation as suffering from severe clinical depression, severe anxiety, posttraumatic stress disorder, and panic disorder. Although Green admitted that DHR had originally intended that the mother submit to a mental-health assessment at Wellstone, a mental-health-services provider, Green said that the mother had been unable to submit to that assessment because of an outstanding bill for previous services at Wellstone. Green further admitted that she had not scheduled a psychological evaluation for the mother until January 2022 and that she had not yet provided the mother with contact telephone numbers for the mother to use to schedule a medication assessment. When asked why the psychological evaluation and provision of contact information for a medication assessment had been delayed, Green

---

[1]The testimony at trial indicated that some confusion had arisen concerning the "color" upon which the mother was to submit to color-code drug screenings, which may have contributed to her missing the February 14, 2022, drug screen.

indicated that she had no answer for those delays. Green also testified that she had recently set up new parenting classes for the mother.

Green testified that the mother had secured stable housing, but she said that she did not know where the mother was living other than "with friends." Green also said that the mother had recently secured employment at a day-care facility. Green offered no testimony concerning the mother's earnings, but the mother was appointed counsel by the juvenile court, indicating that she is indigent.

The mother testified that the child had been removed from her custody in September 2020 when the mother was 17 years old.[2] She admitted that the child was placed into the physical custody of the paternal grandmother pursuant to a safety plan in September 2020 because the mother was a minor and had tested positive for marijuana at the time of the child's birth. The mother testified that she had completed a program called "Healthy Families" and that she had been informed that she did not need substance-abuse services by "Bradford." She said that

---

[2]According to the mother, she turned 18 years only 6 days after the child's birth.

she would follow all recommendations relating to her mental health. The mother further admitted that she had "slipped a little bit with services" but she said that she had done so because she was frustrated and "[felt] like I'm doing all of this and I'm not getting anything out of it." She also stated that she felt like the paternal grandmother "just want [sic] my baby anyway" and believes that the paternal grandmother and paternal grandfather would "kick her out of [the child's] life."

According to the mother, she had become employed at a day-care facility about one month before the trial. Although the mother did not indicate what she earned from her employment, she testified that she was saving money to secure a residence of her own. She said that, as of the time of trial, she was often living with friends and sometimes living with the maternal grandmother, which indicates that she did not have a stable residence. The mother testified that she had reliable transportation.

The mother explained that the child had been returned to her custody, albeit with DHR supervision, in February 2021. She said that she and the child had initially resided with her great-grandmother, C.E.

("the maternal great-grandmother"). However, the mother said, "they" had made her leave the maternal great-grandmother's house because of some conflict with a sibling, after which, she said, she and the child had begun residing with the maternal grandmother. The mother indicated that she and the maternal grandmother suffered from occasional conflict because, the mother admitted, the mother did not like not getting her own way. The mother complained that she had not received enough help with the child when living at the maternal grandmother's home, indicated that she had been "overwhelmed," and said that she had sought help from DHR, which resulted in the child's being placed back in the home of the paternal grandmother in August 2021.

The mother stated:

"I didn't have any help or anything. And then one day I tried to take a shower, and [the child], she was right there. I didn't have anybody to watch her. She gets out of everything. She act [sic] like she just got to be right up under me. So it was hard to do anything. So when I took a shower, she Nair'd her hair and everybody kept saying it was my fault. I couldn't take it anymore."

The mother said that she and the father had ended their relationship in August 2021. She said that she did not feel comfortable

around the paternal grandmother any longer and said that she felt like the paternal grandmother had allowed the father and his new girlfriend to visit with the child more than her. The mother indicated that she would like the maternal grandmother or S.S., who is her stepfather, to supervise visits. The mother admitted that she was not ready to assume custody of the child but said that she desired additional time to complete services so that she could become a capable parent.

Rochelle Jones, an employee of DHR, testified that she had performed a home study on the home of the paternal grandmother and paternal grandfather. She said that the environment was safe but that the paternal grandfather had a criminal history from the period between 1986 and 1996 and had served one year in prison. According to Jones, DHR could not approve the home study because of the paternal grandfather's criminal history but did not oppose a transfer of the child's custody to the paternal grandmother and paternal grandfather. Jones testified that the child was doing well in that placement.

Amanda Gentle, the child's guardian ad litem, testified that, in her opinion, the child's custody should be transferred to the paternal

grandmother and paternal grandfather. She explained that DHR had offered the mother several services and that the mother had attempted but not completed those services. Gentle characterized the mother's attempts at complying with services as "sporadic." As an example, Gentle testified that, in November 2021, the mother had been permitted three opportunities to visit with the child at locations outside of the paternal grandmother's home but that the mother only fully exercised that opportunity once; Gentle said that the mother canceled the first of such visits and cut the third visit short without explanation.

Gentle testified that she had had concerns about the safety of the child during the period between February 2021 and August 2021 when the child had lived in the mother's custody. Gentle testified that, when the mother and the child were living with the maternal great-grandmother, concerns arose about safety after an incident involving a sibling of the mother's shooting a gun at the father's car. Gentle said that, when the mother and the child had been living with the maternal grandmother and Gentle had visited that home, she had observed that the child was being allowed to climb steps unsupervised and that another

11

child in the home was playing in a bathtub of water without supervision. Gentle also testified that the mother had told her that she did not realize how hard it was to care for a baby. Gentle opined that the mother was not in a condition to provide stability for the child. According to Gentle, she would not be comfortable allowing the mother to have visitation with the child in the maternal grandmother's home but would be amenable to allowing the maternal grandmother to supervise the mother's visitation in a public place.

On appeal, the mother first challenges the juvenile court's award of custody to the paternal grandmother and paternal grandfather. Her argument, however, rests solely on her contention that DHR failed to make reasonable efforts to rehabilitate her.

> "'Reasonable efforts' include 'efforts ... to make it possible for a child to return safely to the child's home,' [former] Ala. Code 1975, § 12-15-65(m) [now codified at Ala. Code 1975, § 12-15-301(13)], such as efforts to rehabilitate the parent so that the parent can 'again exercise familial rights and responsibilities toward the child in question.' Miller v. Alabama Dep't of Pensions & Sec., 374 So. 2d 1370, 1374 (Ala. Civ. App. 1979); see also D.M.P. v. State Dep't of Human Res., 871 So. 2d 77, 89 n.10 (Ala. Civ. App. 2003) (plurality opinion). Whether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine. T.B.

v. Cullman County Dep't of Human Res., 6 So. 3d 1195, 1199 (Ala. Civ. App. 2008).

> "'In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented their return to the custody of the parent.... The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.'

"T.B., 6 So. 3d at 1199."

R.T.B. v. Calhoun Cnty. Dep't of Hum. Res., 19 So. 3d 198, 204 (Ala. Civ. App. 2009).

The child was initially removed from the custody of the mother in September 2020 based on the mother's testing positive for marijuana at the time of the child's birth. Although DHR placed the child with the mother in February 2021 in an attempt to reunite them, the mother returned the child to DHR after having difficulty managing to care for the child. The mother admitted that she had not fully participated in services offered to her by DHR, and her admissions show she had no stable residence at which to rear the child at the time of the trial. The

13

mother stated that she would comply with services aimed at assisting her with her mental-health issues, which had only recently been identified in early 2022, but those services had not yet been offered to the mother, in part because of an outstanding bill at one of the mental-health-service providers utilized by DHR.

> "This court has repeatedly recognized that sustained efforts at rehabilitation of the parent must be balanced against the child's need for permanency and stability. See, e.g., T.B., 6 So. 3d at 1202; J.W.M. v. Cleburne County Dep't of Human Res., 980 So. 2d 432, 440 (Ala. Civ. App. 2007); Talladega County Dep't of Human Res. v. M.E.P., 975 So. 2d 370, 374 (Ala. Civ. App. 2007); and D.G. v. State Dep't of Human Res., 569 So. 2d 400, 403 (Ala. Civ. App. 1990). At some point the child's need for permanency and stability overcomes the parent's right to continued rehabilitation. M.W. v. Houston County Dep't of Human Res., 773 So. 2d 484, 487 (Ala. Civ. App. 2000)."

R.T.B., 19 So. 3d at 206. As of the time of the February 2022 trial, the child, who was 17 months old, had resided with the paternal grandmother for approximately 11 months. DHR's attempt to reunite the mother with the child had failed because the mother, who was barely an adult herself, was overwhelmed by the demands of caring for the child. We have explained that DHR is required to assert only "'reasonable efforts' to reunite the family," and we have considered the fact that DHR

has spent considerable time attempting reunification as proof that DHR's efforts were reasonable and that continued efforts were not necessary. See id. (explaining that a 34-month period of attempted rehabilitation was reasonable, especially in light of the fact that, in situations involving foster-care placement of a dependent child, a 12-month period for rehabilitation is considered sufficient in most situations). Based on our review of the record, the evidence indicates that, despite DHR's previous efforts and a period of nearly 18 months, the mother was not rehabilitated sufficiently to assume custody of the child.

"Upon a finding that reasonable efforts at family reunification have failed, a juvenile court may make any disposition that serves the best interests of the child …." R.T.B., 19 So. 3d at 206. The evidence presented at trial indicates that the paternal grandmother and paternal grandfather can provide a stable and loving home for the child, and we cannot agree that DHR should have delayed securing the child's permanency to offer the mother further services. Accordingly, we affirm the judgment of the juvenile court insofar as it awards custody of the child to the paternal grandmother and paternal grandfather.

The mother also challenges the award of visitation. She complains that the visitation award is overly restrictive and violates her right to visitation, which, as she correctly notes, she maintains. Ala. Code 1975, § 12-15-102(23) (defining the residual rights maintained by the parent of a child's whose custody has been transferred by a juvenile court); R.B.O. v. Jefferson Cnty. Dep't of Hum. Res., 70 So. 3d 1286, 1291 (Ala. Civ. App. 2011) (plurality opinion) (applying former Ala. Code 1975, § 12-15-1(24), and stating that "[a] parent who has lost custody of a child through dependency proceedings retains the residual right to visitation with the child"). The visitation awarded by the juvenile court in the present case provides the paternal grandmother and the paternal grandfather almost total control over when and where the mother may visit with the child. The juvenile court included a provision requiring that, if the parties could not agree on the details of visitation, the mother could visit at a visitation center for two hours on the first Saturday of each month, at her own expense. The mother contends that, practically speaking, the award of visitation in the present case is illusory. See J.C. v. Houston Cnty. Dep't of Hum. Res., 313 So. 3d 1137, 1142 (Ala. Civ. App. 2020) (explaining that

16

a visitation award that "gives the custodian the unfettered right to arrange, or to decline to arrange, visitation between the mother and the child at her sole discretion … provides only an illusory right to visitation in the mother"). Under the circumstances of the present case, we agree.

"[T]he standard governing visitation in dependency cases is the same as the standard governing visitation in divorce cases." M.C. v. Jefferson Cnty. Dep't of Hum. Res., 198 So. 3d 518, 522 (Ala. Civ. App. 2015). As we explained in K.D. v. Jefferson County Department of Human Resources, 88 So. 3d 893, 897-98 (Ala. Civ. App. 2012) (quoting R.B.O., 70 So. 3d at 1288-89 (footnotes omitted)):

> "'In dependency cases, a juvenile court possesses discretion over visitation, pursuant to former § 12-15-71(a)(4), Ala. Code 1975[, now codified at Ala. Code 1975, § 12-15-314(a)(4).] That Code section provided that the juvenile court shall exercise its discretion according to the "welfare and best interests of the child." Notably, that standard is identical to the standard used for determining the visitation rights of noncustodial parents in divorce cases. See Carr v. Broyles, 652 So. 2d 299, 303 (Ala. Civ. App. 1994) ("[T]he primary consideration in establishing the visitation rights accorded a noncustodial parent is always the best interests and welfare of the child."). In Carr, this court held that, under the best-interests standard, in order "to limit a parent's visitation based on misconduct, the limitation ordered must

17

> be supported by evidence that the misconduct of the parent is detrimental to the child." 652 So. 2d at 304 (citing Jones v. Haraway, 537 So. 2d 946, 947 (Ala. Civ. App. 1988)); see also Ex parte Thompson, 51 So. 3d 265, 272 (Ala. 2010) ("A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.").'"

Unlike the mother in K.D. and the father in R.B.O., the mother in the present case does not challenge the requirement that her visitation be supervised. However, we find the principles discussed in K.D. and R.B.O. to be as apt in the mother's situation as they were to the situations of the respective parents in K.D. and R.B.O.

We have repeatedly reversed visitation awards that permit a custodian almost unfettered discretion to control visitation with a parent. See, e.g., D.B. v. Madison Cnty. Dep't of Hum. Res., 937 So. 2d 535, 541 (Ala. Civ. App. 2006); K.B. v. Cleburne Cnty. Dep't of Hum. Res., 897 So. 2d 379 (Ala. Civ. App. 2004); and K.L.U. v. M.C., 809 So. 2d 837 (Ala. Civ. App. 2001). By and large, the visitation provision crafted by the juvenile court in the present case permits the paternal grandmother and the paternal grandfather to forestall visitation by the mother at their total discretion. See D.B., 937 So. 2d at 541 (reversing a judgment awarding

visitation that had made "[the mother's] visitation with the child 'subject to any conditions and limitations determined to be necessary and appropriate by [the child's custodian]'"). The juvenile court attempted to ameliorate the improper visitation provision by providing that the mother must have two hours of visitation a month, which, if the parties cannot otherwise agree on the details of visitation, may be held at a visitation center at the mother's expense.

However, we fail to find that aspect of the provision sufficient to save it from reversal. We have explained that "'[a] juvenile court exceeds its discretion … when it imposes an overbroad restriction on visitation that does more than is necessary to protect the child and thereby unduly infringes on the parent-child relationship.'" K.D., 88 So. 3d at 897-98 (quoting R.B.O., 70 So. 3d at 1291). As the mother contends, nothing in the record indicates that the juvenile court had a basis for providing the mother with such a limited amount of guaranteed visitation. See P.D. v. S.S., 67 So. 3d 128, 136 (Ala. Civ. App. 2011) (reversing a judgment providing for supervised visitation based on "the lack of evidence indicating that the mother had ever abused the children or had placed

19

the children in harm's way").  DHR returned the child to the care of the mother in February 2021, indicating that, at least at that time, nothing in the mother's conduct or condition placed the child in such danger that contact between the child and the mother should be limited in duration. At the February 2021 trial, DHR presented no evidence that the mother posed a particular danger to the child such that her visitation should be limited to a mere two hours per month.

Furthermore, the requirement that the mother, who is an indigent 19-year-old, pay for visitation at a visitation center in order to secure the minimal amount of visitation that she has been afforded creates a situation that is untenable.  Because the paternal grandmother and the paternal grandfather wield control over almost all aspects of the mother's visitation, to be assured of any contact with the child, the mother must arrange visitation at a visitation center on the first Saturday of each month and pay for that visitation.  If the mother does not arrange such visitation or cannot afford to pay for such visitation (the cost of which does not appear in the record), the paternal grandmother and the paternal grandfather could easily prevent visitation with the mother by

not agreeing to the times or alternate places that the mother may suggest for visitation.

Accordingly, we reverse the judgment of the juvenile court insofar as it awarded the mother only two hours per month in guaranteed visitation, required that the mother assume the costs of visitation at a visitation center, and permitted the paternal grandmother and the paternal grandfather nearly unfettered discretion over the time and place of the mother's visitation, and we remand the cause for entry of a judgment consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Thompson, P.J., and Moore, Hanson, and Fridy, JJ., concur.