REL:  April 28, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

### CL-2022-0965

_____

## N.G.

### v.

## Pike County Department of Human Resources

_____

### CL-2022-1000

_____

## C.G.

### v.

## Pike County Department of Human Resources

### Appeals from Pike Juvenile Court
### (JU-22-44.01)

CL-2022-0965 and CL-2022-1000

EDWARDS, Judge.

In May 2022, the Pike County Department of Human Resources ("DHR") filed a dependency petition in the Pike Juvenile Court ("the juvenile court") seeking to have S.G. ("the child"), the child of N.G. ("the mother") and C.G. ("the father"), declared to be a dependent child. After a trial held on July 25, 2022, the juvenile court entered a judgment on August 1, 2022, determining the child to be a dependent child, awarding his legal custody to DHR, and relieving DHR of making reasonable efforts to reunify the child with the mother and the father. The mother filed a postjudgment motion, which the juvenile court denied on August 27, 2022, and the mother filed a timely notice of appeal on September 3, 2022. Her appeal was docketed as case number CL-2022-0965.

The juvenile court, in compliance with Ala. Code 1975, § 12-15-312(e), held a permanency hearing on August 29, 2022. After that hearing, the juvenile court entered a permanency order on September 1, 2022, approving the concurrent permanency plans of adoption by current foster parent or adoption by an unidentified resource. The father filed a motion seeking reconsideration of the September 1, 2022, permanency

2

order and a notice of appeal from that order on September 15, 2022. The juvenile court denied the father's motion to reconsider on September 18, 2022. The father's appeal was docketed as case number CL-2022-1000. We consolidated the mother's appeal and the father's appeal ex mero motu.

The juvenile court took testimony relating to the child's dependency at several evidentiary hearings, including at two shelter-care hearings held on May 12, 2022, and on June 1, 2022, at a hearing on the mother's motion to amend the shelter-care order and for visitation held on June 27, 2022, and at the trial on the dependency petition held on July 25, 2022.[1] The testimony and evidence presented at those hearings reveals that the child was initially taken into DHR's custody on May 11, 2022, when Joseph Donofrio, a law-enforcement officer employed by the City of Troy Police Department, contacted DHR during his response to a

---

[1]The transcript of the trial on the dependency petition, which was transcribed from a video recording, reflects that the dependency trial was held on July 14, 2022; however, the record reflects that, although the dependency trial was, at one time, scheduled for July 14, 2022, the juvenile court granted a motion to continue the trial and rescheduled it for July 25, 2022.

domestic-violence incident between the mother and the father. Donofrio testified that the father had requested that law-enforcement officers come to the mobile home in which he and the mother were living when the mother returned to that mobile home after her release from jail, following the expiration of a 24-hour hold resulting from her arrest for domestic violence on or about May 10, 2022. Donofrio indicated that the father reported that the mother was beating on the door and that he was concerned that the mother was not taking her mental-health medication or had possibly taken illegal drugs. According to Donofrio, the mother was upset and wanted to leave the residence with the child, who was in the mobile home with the father.

Donofrio described the mobile home as being in a state of "renovation," with extension cords lying around the interior of the mobile home and bare plywood floors. He also said that the mobile home was "not really a good place for a baby." Donofrio said that the parents were known to local law-enforcement officers because of the number of domestic-violence calls received from the mother and the father. He testified that, to his knowledge, neither the mother nor the father had

transportation or employment and neither had friends or family in the area.

Donofrio then described his attempts to persuade the father to relinquish the child to the on-call DHR caseworker, Amy Floyd. Donofrio said that the father was uncooperative and that the father, who was holding the child in his arms, had walked to a table in the bedroom and picked up a knife. According to Donofrio, he became concerned for the safety of the child and that the incident might become a hostage situation, so he unholstered his taser, which, he said, had prompted the father to return the knife to the table. Donofrio admitted that he had been unable to establish a rapport with the father, so, Donofrio said, he had requested that another law-enforcement officer attempt to convince the father to relinquish the child to DHR, which attempt, he said, had been successful.

Floyd testified similarly regarding the incident with the knife. She described the father as being uncooperative and belligerent and reported that he had used profanity during the incident. According to Floyd, the mother had been very angry when Floyd arrived at the mobile home that

evening. Floyd also said that the mother was emotional and crying and that she had used profanity but that she had later calmed down. She testified that the mother had told her that evening that she had nowhere to go and that she and the father had no relatives in the area.

The mother testified that she has 10 surviving children and that the father is the father of 9 of those children. She admitted that, as of the date of the dependency trial, none of her children lived with her or had been reared by her. In fact, the mother admitted that she had voluntarily relinquished her parental rights to at least five of her children and that her parental rights to two of her children had been involuntarily terminated by an Alabama court. The mother testified that she and the father had been in a relationship for 15 years. She described their relationship as abusive but also admitted that, at times, she had been the perpetrator of domestic violence between her and the father.

The mother testified that she had left the father in October 2021 and entered a domestic-violence shelter for homeless pregnant women in Baldwin County called Mary's Shelter Gulf Coast ("the shelter"). Although the mother indicated that she had been doing well in the

6

shelter, where she had received counseling, had participated in Narcotics Anonymous ("NA") meetings, had been pursuing her GED, and had maintained employment, she admitted that she still contacted the father on a regular basis. She explained that she had left the shelter in January 2022 and had returned to Troy only to realize that the father had not become sober and had not renovated the mobile home with the money that she had been sending him. She said that, when she realized that the father had lied to her, she had returned to the shelter.

The mother further testified that, after she had delivered the child in March 2022, she again contacted the father and, in early May 2022, again returned to Troy. She testified that she had again realized that the father was not sober, that he had not renovated the mobile home, and that she had made a mistake by returning to Troy so that they could "co-parent." The mother candidly admitted that, despite having been clean and sober since October 2021, she had smoked weed and methamphetamine in early May 2022 when she reunited with the father.

The mother testified that, after the May 11, 2022, incident, she had returned to Baldwin County to live with a friend and that she had been

reaccepted into the shelter in June 2022. However, at the time of the dependency trial in July 2022, the mother was no longer living at the shelter and was no longer enrolled in any shelter-sponsored programs. She said that she had been asked to leave the shelter after she had an emotional outburst at an event for the residents of the shelter on July 4, 2022. The mother testified that, at the time of the dependency trial, she was seeking treatment for her mental-health issues, was still taking the medication prescribed for her depression, was regularly attending NA meetings, was employed, and had secured a vehicle.

The mother also testified that she had secured a protection-from-abuse order against the father and that she was planning to file for a divorce from the father. She said that she had not spoken with the father since she had last left Troy and that she did not intend to reinitiate contact with the father or to resume their relationship. The mother admitted, however, that she had left the father on previous occasions and had returned to resume the relationship.

The father testified that he was participating in and had good standing with drug court. He indicated that he had been passing all of

his drug tests and that he had been clean for almost one year. The father specifically denied that he had smoked marijuana or methamphetamine with the mother in May 2022. He admitted that he had been arrested approximately 30 times for domestic violence but said that he had never been convicted.

According to the father, he and the mother had always planned for her to return to Troy after the child was born. He said that the mother had called him almost daily from the shelter. He testified that, when the mother had returned to Troy in May 2022, he had thought that she was "clean" and that they would "give it a try," but, he said, the mother had been "no different."

Like the mother, he indicated that he did not intend to resume their abusive relationship. He said that he had not been served with divorce papers and that he had intended to file for a divorce himself on the Wednesday following the dependency trial, which was held on Monday, July 25, 2022. According to the father, he is employed and works from 4:30 p.m. to 2:00 a.m. He said that he had located a daycare in the area that would provide care to the child during those hours.

9

Tiffany Parker, the foster-care caseworker assigned to the child's case, testified that DHR's concerns about the parents were founded on their history of domestic violence and drug use. She explained that the mother and the father both had pending domestic-violence charges. Parker said that the father was participating in drug court and that he had been testing negative for illegal substances. She also said that the mother had tested positive for methamphetamine on a June 30, 2022, hair-follicle dug test but that the results of the mother's most recent drug test had not yet been received by DHR.

Parker testified that DHR was also concerned by the fact that not one of the mother's and the father's children were in their custody. She testified that DHR had successfully sought the termination of their parental rights to the child's siblings, M.G. and U.G.; the judgment of the Crenshaw Juvenile Court terminating the parental rights of the mother and the father to U.G. and the judgment of the juvenile court terminating the parental rights of the mother and the father to M.G. were admitted into evidence and are contained in the record on appeal. According to Parker, she had informed both the mother and the father that DHR

intended to pursue the termination of their parental rights. She also indicated that DHR had recently been given the name of the mother's father ("the maternal grandfather") as a potential resource but said that the maternal grandfather had been rejected by DHR in the case involving M.G.

The juvenile court's factual findings in a dependency case when the evidence has been presented ore tenus are presumed correct. T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006). A finding of dependency must be supported by clear and convincing evidence. Ala. Code 1975, § 12-15-310(b). When a juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. K.C. v. Jefferson Cnty. Dep't of Hum. Res., 54 So. 3d 407, 413 (Ala. Civ. App. 2010). In addition, the juvenile court may consider the totality of the circumstances when making a finding in a dependency proceeding. G.C. v. G.D., 712 So. 2d 1091, 1094 (Ala. Civ. App. 1997); see also T.D. v. S.R., 293 So. 3d 434, 436 (Ala. Civ. App. 2019); R.G. v. Calhoun Cnty. Dep't of Hum. Res., 716 So.

11

2d 219, 222 (Ala. Civ. App. 1998); and <u>D.P. v. State Dep't of Hum. Res.</u>, 571 So. 2d 1140 (Ala. Civ. App. 1990).

The term "dependent child" is defined in Ala. Code 1975, § 12-15-102, as follows:

"(8) DEPENDENT CHILD. a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:

"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in [Ala. Code 1975, §] 12-15-301 or neglect as defined in [§] 12-15-301, or allows the child to be so subjected.

"2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.

"3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.

"4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state.

12

"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in [Ala. Code 1975, §] 12-15-301[(1)].

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"7. Who has been placed for care or adoption in violation of the law.

"8. Who, for any other cause, is in need of the care and protection of the state."

<u>The Mother's Appeal</u>

In her brief on appeal, the mother challenges the juvenile court's dependency finding. She also complains that the juvenile court erred by not awarding her visitation with the child. We affirm the juvenile court's judgment.

The mother argues that the child does not meet the definition of a dependent child found in § 12-15-102(8)a. She specifically contends that the child

"was not subject to any abuse or neglect by the mother, was not without a parent willing and able to provide for him, was not deprived of any necessary medical care, was not being

13

> withheld from school, was not abandoned, was not without a parent willing and able to discharge he responsibilities to the child, was not placed for care or adoption in violation of the law, and was not in need of the care and protection of the state."

We disagree.

The mother has not maintained custody of any of her 10 children. Most recently, in March 2020, the Crenshaw Juvenile Court terminated her parental rights to U.G., and, in September 2021, the juvenile court terminated her parental rights to M.G. The mother and the father had a long history of domestic violence, the mother had repeatedly resumed her tumultuous relationship with the father after attempting to leave him, and the mother admitted to using methamphetamine and marijuana in May 2022 after having spent considerable time avoiding drug use while at the shelter. The judgments terminating the mother's parental rights to U.G. and M.G. recite facts indicating that the mother failed to submit to drug testing, failed to complete drug treatment, failed to cooperate with DHR and the reunification plan, and failed to adjust her circumstances to meet the needs of her children.

14

Although this appeal arises from a dependency action and not a termination-of-parental-rights action, we find Ala. Code 1975, § 12-15-319(a)(8), instructive in this situation. Section 12-15-319(a)(8) provides that a juvenile court, when "determining whether or not [a] parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child" in a termination-of-parental-rights proceeding, may consider the fact "[t]hat parental rights to a sibling of the child have been involuntarily terminated" to support such a determination. Pursuant to §12-15-102(8)a.6., a child may be determined to be dependent when the child "is in need of care or supervision" and has a "parent … unable or unwilling to discharge his or her responsibilities to and for the child." The termination of the mother's parental rights to U.G. and M.G. supports a conclusion that "the mother is unable or unwilling to discharge her responsibilities to and for the child" and therefore also supports a conclusion that the child is dependent. Accordingly, we reject the mother's argument that the juvenile court lacked sufficient evidence to support its conclusion that the child was dependent.

We also reject the mother's argument that the juvenile court erred by not awarding her visitation with the child. The mother is correct that this court has quite often reversed judgments that permit a custodian to have unfettered discretion over the visitation rights of a noncustodial parent of a dependent child. See, e.g., J.C. v. Houston Cnty. Dep't of Hum. Res., 313 So. 3d 1137, 1141 (Ala. Civ. App. 2020); D.B. v. Madison Cnty. Dep't of Hum. Res., 937 So. 2d 535, 541 (Ala. Civ. App. 2006) (plurality opinion) ("This court has previously held that it is reversible error for a trial court to leave a noncustodial parent's visitation rights with his or her child to the discretion of the custodial parent or other legal custodian of the child."). Although the mother, as a parent of a dependent child, retains, as a residual parental right, "the right of visitation," Ala. Code 1975, § 12-15-102(23), nothing in the Alabama Juvenile Justice Act, Ala. Code 1975, § 12-15-101 et seq., requires that a juvenile court award visitation to a parent of a dependent child. Instead, "a [juvenile court] has broad discretion to determine a parent's right to visitation with a dependent child[,] and … the best interests and welfare of the child is the primary consideration in determining whether to award visitation and,

16

if so, the extent of that visitation." Y.N. v. Jefferson Cnty. Dep't of Hum. Res., 67 So. 3d 76, 82 (Ala. Civ. App. 2011) (emphasis added).

The juvenile court's extensive discretion over the disposition of dependent children is set out in Ala. Code 1975, § 12-15-314(a)(4), which provides that a juvenile court may "[m]ake any other order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the [dependent] child." In this particular case, in which DHR has been relieved of making reasonable efforts to reunify the child with the mother and the father and has already informed the mother that it intends to pursue termination of her parental rights and in which the permanency plan is adoption by current foster parent, the juvenile court could reasonably have determined that an award of visitation to the mother would not serve the child's best interest. Thus, we cannot conclude that the juvenile court erred by failing to award the mother visitation with the child.

## The Father's Appeal

As explained in the procedural history, the father's appeal was taken from the September 1, 2022, permanency order and not from the

August 1, 2022, dependency judgment. In his brief on appeal, the father argues that the juvenile court erred to reversal by failing to hold a permanency hearing within 30 days of the determination that DHR was relived of making reasonable efforts to reunite the mother and the father with the child.[2] See § 12-15-312(e) (providing that, "[i]f reasonable efforts are not made with respect to a child as a result of a determination made by a juvenile court in situations described [in § 12-15-312(c)], a permanency hearing … shall be held for the child within 30 days after the determination"). He also argues that DHR failed to consider the maternal grandfather as a potential relative resource before seeking to be relieved of the duty of providing reasonable efforts. However, the father's appeal suffers from a jurisdictional defect -- the September 1, 2022, permanency order did not adjudicate any rights of the father and therefore cannot support an appeal. Ex parte F.V.O., 145 So. 3d 27, 30 (Ala. 2013). Accordingly, we dismiss the father's appeal.

---

[2]We note that the determination that DHR was not required to make reasonable efforts to reunify the father and the child was made in the August 1, 2022, dependency judgment and that the August 29, 2022, permanency hearing was held within that 30-day period.

18

Conclusion

Because we have rejected the mother's arguments, we affirm the judgment of the juvenile court declaring the child dependent in appeal number CL-2022-0695. Because the September 1, 2022, permanency order does not affect the substantial rights of the father, that order cannot support the father's appeal, and the father's appeal in appeal number CL-2022-1000 is dismissed.

CL-2022-0965 -- AFFIRMED.

CL-2022-1000 -- APPEAL DISMISSED.

Thompson, P.J., and Moore, Hanson, and Fridy, JJ., concur.